COMMONWEALTH *vs.* DWIGHT WILLIAMS.

Middlesex. February 12, 2010. - May 21, 2010.

Present: MARSHALL, C.J., SPINA, COWIN, BOTSFORD, & GANTS, JJ.

*Practice, Criminal,* Motion to suppress, Disclosure of evidence, Discovery, Sentence, Comment by judge, Capital case. *Evidence,* Admissions and confessions, Hearsay, Authentication, Consciousness of guilt, Telephone conversation. *Witness,* Cross-examination. *Evidence,* Bias, Offer of proof. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Privacy. *Homicide. Firearms.*

A Superior Court judge, in denying a criminal defendant's pretrial motion to suppress his statements to police following his arrest, did not err in concluding that the defendant had made a valid oral waiver of his Miranda rights, despite the defendant's refusal to sign a Miranda form and to have his interview with the police tape recorded [864]; further, the motion judge correctly ruled that a State trooper's statement about the defendant's need to sign the waiver forms did not render the defendant's statements involuntary [864-865].

A State trooper did not violate G. L. c. 276, § 33A, which mandates that a criminal defendant be permitted to make a telephone call within one hour after arrival at a police station, by providing his cellular telephone for a criminal defendant to use rather than a police station telephone, as there is no statutory requirement that a defendant be permitted a private telephone, and a defendant has no expectation of privacy in making such a call. [865-867]

At a murder trial, the judge erred in admitting in evidence the contents of messages received by one witness at her account at a social networking Web site, urging the witness not to testify against the defendant, where there was insufficient evidence to authenticate the messages, which the Commonwealth alleged were sent by the defendant's brother, and where the messages could have been viewed by the jury as evidence of consciousness of guilt; however, the jury's consideration of the messages did not create a substantial likelihood of a miscarriage of justice, given the strength of the evidence against the defendant. [867-870]

There was no merit to a criminal defendant's argument, made in a motion for a new trial, that the Commonwealth had made late disclosure of certain evidence in violation of its discovery obligations, where the evidence was not in the possession of the Commonwealth until a witness, who appeared pursuant to a summons, produced it at trial, at which point the Commonwealth immediately provided the evidence to defense counsel. [870-871]

At a murder trial, the judge properly admitted in evidence a firearm found on the person of the defendant's cousin five days after the murder, where the firearm, which had the same unusual defect as the alleged murder weapon, was sufficiently linked to the killing. [871]

At a murder trial, the judge did not err in limiting defense counsel's cross-examination of a Commonwealth witness regarding a pending criminal case against him, where the excluded questions concerning the pending case were either repetitive of those defense counsel had already put or concerned substantive details of the case not relevant to his point [872-873]; further, the judge did not abuse his discretion in limiting the questioning regarding certain dismissed charges against the witness, where the defendant's offer of proof was insufficient to warrant further inquiry into the subject, and where, in any event, the questions would have been cumulative of the inquiry into the pending case [873-874].

There was no merit to a criminal defendant's claims that the judge at his trial demonstrated bias against him during the seating of the jury, or during an offer of proof during cross-examination of a witness. [874]

This court remanded a criminal matter for resentencing, where the trial judge exceeded the statutory maximums by one day in each of two of the defendant's sentences. [875]

INDICTMENTS found and returned in the Superior Court Department on December 8, 2005.

A pretrial motion to suppress evidence was heard by *Paul A. Chernoff*, J., and the cases were tried before *Herman J. Smith, Jr.*, J.

*David H. Mirsky* for the defendant.

*Casey E. Silvia*, Assistant District Attorney (*Elizabeth Keeley*, Assistant District Attorney, with her) for the Commonwealth.

COWIN, J. The defendant was convicted by a jury in the Superior Court of murder in the first degree on a theory of deliberate premeditation. The victim was twenty-two year old Izaah Tucker. The defendant was convicted also of assaulting Michael Gemma with intent to commit murder; assaulting Gemma by means of a dangerous weapon; and unlawful possession of a firearm. The defendant appeals from the judgments. He contends that the motion judge (who was not the trial judge) improperly denied his motion to suppress his statements to the police because the Commonwealth failed to prove that the defendant properly waived his Miranda rights and because the Commonwealth did not prove that the subsequent statements were voluntary.

As to the trial, he claims two evidentiary errors: the admission of the contents of a "MySpace" computer message and the admission of a firearm described as the murder weapon. He asserts further that he was denied his right to confrontation; that

the judge was biased against him; and that his counsel was ineffective. Finally, he maintains that the sentences for assault with intent to murder and assault with a dangerous weapon exceed the statutory maximums. We agree that those sentences exceed the statutory maximums and must be vacated, and we therefore remand the case for resentencing. We reject the defendant's other claims, and affirm his convictions. After review of the entire record pursuant to our responsibility under G. L. c. 278, § 33E, we decline to exercise our power to grant extraordinary relief.

1. *Facts.* We summarize briefly the facts the jury could have found, leaving most of the evidence for discussion in connection with the specific issues raised. In the early morning of October 1, 2005, the victim was shot to death in the Riverside Projects housing development in Medford. The Commonwealth's case rested primarily on the testimony of two witnesses present at the shooting, Gemma and Larry Baker Powell. Powell testified after entering into a cooperation agreement with the Middlesex district attorney's office. Corroboration testimony came from two women who were with the defendant and Powell that night.

Powell spent the night of the murder at the apartment where he and his fifteen year old girl friend, Ashlei Noyes, lived with her mother and younger sister. At one point during the evening, the defendant and his "date" appeared at the apartment. The defendant talked on a "direct connect" Nextel cellular telephone[1] with the victim about selling him a gun. The defendant pulled out a revolver at one point and began playing with it, putting bullets in the weapon and taking them out. He passed the gun to Powell.

Later, Powell and the defendant left to meet the victim. En route, the defendant told Powell that he planned to "pop" the victim. The victim appeared at the meeting place with a friend, Gemma. Gemma and Powell hung back while the defendant and the victim walked ahead to consummate the sale. Instead of selling the gun to the victim, the defendant shot him. The defendant ran back, began shooting at Gemma, and yelled to Powell to

---

[1] A "direct connect" Nextel cellular telephone was described as one that works like a "walkie-talkie" by pressing a button and talking directly to a person.

empty the victim's pockets. Powell did as he was told, taking just under $300 from the victim. Gemma raced from the scene, escaping the shots.

2. *Motion to suppress.* The defendant contends that the motion judge improperly denied his motion to suppress his statements to the police following his arrest on October 19, 2005. He claims that his refusals to sign the Miranda waiver forms indicated that he did not waive his rights and that a State trooper "misrepresented" to him that he must sign the Miranda form to "protect" both the defendant and the trooper. The defendant argues also that failure to permit him to use the police station telephone after his arrest violated G. L. c. 276, § 33A,[2] and required suppression of his statements.

a. *Facts.* We summarize the motion judge's comprehensive findings, supplemented by uncontested testimony from the hearing. On the day in question, October 19, 2005, the defendant was arrested in Boston at approximately 6 A.M. pursuant to a warrant. The police found the defendant in his bed and placed him on his knees on the floor. Trooper Michael Banks of the State police, who was a former assistant district attorney, was assigned to the scene to administer the Miranda rights to the defendant, and did so. The defendant responded "yes" when asked if he understood the rights. There was no further questioning of the defendant at that time, and Banks detected no odor of alcohol from the defendant.

The defendant was transported to a Boston police "gang unit" office and taken to a conference room where at least two officers, Trooper Robert Manning of the State police and Detective John Brady of the Medford police department, were present. The defendant was informed that he was under arrest for murder and he was advised of his rights "including Miranda, telephone, and recorded statement rights." (The "recorded statement right" informed the defendant that it was the Boston police department

---

[2]General Laws c. 276, § 33A, provides: "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

policy to record all interviews and requested the defendant's permission to tape record his conversation with the officers.) Manning read from a form that contained the Miranda rights and the information with respect to a recorded statement. Although the defendant orally acknowledged his understanding of the rights, he refused to sign the form. A police witness nevertheless signed the form. The defendant stated also that he did not want any recording made and refused to sign the recording form. The trooper said that the defendant could make "any number of phone calls" from the trooper's cellular telephone. The defendant said that he would listen to what the police had to say and then would make his calls.

Manning informed the defendant that the police could place him at the murder scene. Manning said that the police wanted to talk with the defendant. The defendant replied that he "probably didn't have much to say." He added that he was a friend of the victim and was hurt by the "talk" that he was involved in the death. The defendant denied any involvement with the killing and said he had heard about it from other people. He suggested that the victim was having "problems" with "H-block," a reference to a certain "group of kids from Somerville."

At 7:50 A.M., Manning read a "Rosario" form to the defendant. See Commonwealth v. Rosario, 422 Mass. 48, 55-57 (1996) (otherwise admissible statement not to be excluded due to unreasonable delay in arraignment, if statement was made within six hours of arrest or if defendant made informed and voluntary written or recorded waiver of right to be arraigned without unreasonable delay). Manning explained that, because it was a weekday, there should be no delay in getting the defendant before the District Court. Manning told the defendant that he should read and sign the waiver form to protect himself as well as the police. The defendant refused to sign the form, and a note to that effect was placed on it. The defendant continued to speak with the officers, who "pressed" him about his whereabouts at the time of the killing and the inconsistencies in many of his statements. The defendant denied speaking with the victim on the night of the murder and described again problems the victim had with "H-block." Finally, he stated, "Look, the only thing you have to know about the shooting is that I had nothing to do with it."

At 8:30 A.M., the defendant was given a cellular telephone and telephoned three family members, one of whom contacted an attorney. The trooper reviewed his notes of the conversation with the defendant, who agreed only that they had been talking about the "subject of the notes." The defendant indicated that he was not feeling well and spit up in a barrel, saying that "it must have been the champagne from the previous night." The defendant was given one or two cigarettes and cold drinks.

At 9 A.M., the defendant was formally booked by the Boston police and advised of his Miranda rights from a form which the defendant also read. The defendant "signed" the form by printing his name, and a Boston police officer witnessed the signing. The defendant did not appear to be under the influence of drugs or alcohol, and the officer did not recall any problem communicating with him. The defendant was then transported to the Medford police station.

At about 10:30 A.M., the defendant was booked at the Medford police station. He provided his address and social security number. The defendant was read his Miranda rights once again by Manning and the card was signed on both sides by a Medford police officer and by the defendant. The defendant appeared sober and had no difficulty understanding the officers.

Later in the morning, Manning was informed that the defendant wished to speak with him. Manning and Brady met with the defendant in a meeting room. Manning stated that he would go over the Miranda form and the tape recording form again and that the police would not speak with the defendant unless he signed the forms. The trooper read the Miranda rights aloud from the form and the defendant signed the form this time, acknowledging that he understood the rights and wished to speak with the police. Manning also explained about tape recording the conversation and the defendant signed the form, marking that he did not want to be recorded. The defendant signed the Rosario form and indicated that he was delaying his arraignment by requesting to speak with the police.

The police asked the defendant why he wanted to talk with them, and he responded that he believed that Powell had "some involvement." He said that Powell was one of the first people to tell him about the murder and that he thought that Powell was involved because he was an "instigator." Manning told the

defendant that he had given the police three or four versions of his actions on the night of the murder. The defendant then repeated his original story, that he had been with his girl friend on the night of the murder, but changed his story again, saying that he had been with a girl he had met on the Internet. He later wavered, saying that these events might have been on another night.

At this point, at approximately 12:30 P.M., the defendant was told that a woman who said she was his lawyer wanted to speak with him on the telephone. After speaking with her, the defendant informed the police that she had said he should not talk. The interview ended and the defendant was brought to the District Court for arraignment.

The motion judge found that the defendant waived his right against self-incrimination knowingly, voluntarily, and intelligently. He found that the Miranda warnings were "properly" administered at all relevant times: when the defendant was arrested, twice at the Boston "courtesy" booking, then at the Medford booking, and at the questioning in Medford. Despite the fact that the defendant refused to sign the original Miranda form, he orally indicated that he understood his rights. In addition, the judge found that the defendant had been advised of his Miranda rights when he was arrested on two prior occasions (in 2001 and 2004) and had exercised his right to remain silent at least one of those times. The judge stated that there were no allegations that the defendant was intoxicated, physically harmed, illiterate, or suffering from mental illness.

On the question of voluntariness, the motion judge accepted Manning's explanation that when he told the defendant that the police would not talk to him again unless he signed the forms, Manning meant that he was "protecting the rights of the defendant." The judge noted also that the defendant had significant experience with the criminal justice system, was given cold drinks and cigarettes, and was allowed to make several telephone calls, all factors which tend to prove the voluntariness of statements. The judge concluded that there was no other evidence that the defendant's statements were given involuntarily and that therefore they would not be suppressed.

b. *Law*. In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear

error. The weight and credibility to be given testimony is for the judge. See *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990), and cases cited. However, we review independently the judge's application of constitutional principles to the facts found. *Commonwealth* v. *Contos,* 435 Mass. 19, 32 (2001).

A valid Miranda waiver is one that is made knowingly, intelligently, and, in all respects, voluntarily. The Commonwealth bears a heavy burden to make this showing. *Miranda* v. *Arizona,* 384 U.S. 436, 475-476 (1966). *Commonwealth* v. *Murray,* 359 Mass. 541, 546 (1971). "To determine whether to admit a defendant's statements, a court must examine the totality of the circumstances, including the characteristics of the accused and the details of the interrogation." *Commonwealth* v. *Silva,* 388 Mass. 495, 501 (1983).

c. *Discussion.* (i) *Refusal to sign forms.* The defendant maintains that his "repeated" refusals to sign the forms establish that he did not intend to waive his Miranda rights. However, the motion judge's finding that the defendant voluntarily waived his right to remain silent is grounded in the evidence and supported by our cases. The police informed the defendant many times that he had the right to remain silent and yet he chose to speak with them. Indeed, on the final occasion that he spoke with the police in Medford, the defendant initiated the conversation. In addition, the evidence supports the determination that the defendant understood his right to remain silent. As stated, he had been arrested twice previously, had been given Miranda warnings each time, and had exercised his right to remain silent on at least one of those occasions. A defendant's refusal to sign a Miranda form and to have an interview tape recorded does not preclude a finding that a valid oral waiver of Miranda rights occurred. See *Commonwealth* v. *Groome,* 435 Mass. 201, 217-218 (2001).[3]

(ii) *"Misrepresentation" by trooper.* The defendant argues

---

[3]The defendant claims also that the police should have informed him that failure to sign the forms did not mean that his statements would not be used against him. This argument was not raised below; thus, the motion judge made no finding directly on the point. However, it follows from the judge's findings that such an explanation was not necessary. The judge concluded that the defendant was not unfamiliar with the criminal justice system and knew he did not have to speak with the police, and that the police informed him several times that anything he said could be used against him.

that Manning "misrepresented" the defendant's "right to defend himself at trial" by telling him that he must sign the Miranda forms in order to "protect" both the defendant and the trooper. The defendant asserts that his statement to the police that he "probably didn't have much to say" was "met with" Manning's statement that the defendant needed to read and sign the waiver forms to "protect" both Manning and the defendant, and that this statement constituted improper coercion.[4]

The motion judge ruled correctly that the trooper's statement about the need to sign the forms did not render the defendant's statements involuntary. A statement is involuntary if the defendant's will is "overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth* v. *Hilton*, 450 Mass. 173, 177 (2007), quoting *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995). Manning's statement did not have such effect. Rather, as the judge concluded, the trooper intended to convey that he was "protecting the rights of the defendant" by advising him of his rights and obtaining a written waiver of those rights. The trooper's statement was not unfair or incorrect. Most likely, the trooper was concerned that the defendant's statement that he "probably didn't have much to say" could be interpreted as an invocation of silence, and the trooper wanted a clear paper record establishing that the defendant was waiving the Miranda rights. The trooper's statement may not have been artfully phrased, but he was essentially saying that the warnings are required for the protection of defendants and that the signing of the forms is a means of proving that the police have provided a defendant with the necessary warnings. Nothing in the record suggests that the defendant's will was overborne.[5,6]

(iii) *Right to use the telephone.* The defendant asserts also

---

[4]Although the defendant asserts that his statement that he "probably didn't have much to say" was "met with" Manning's response that he "needed to" read and sign the forms, the order in which these statements were made is not clear from the record.

[5]The defendant claims that Manning "displayed his firearm" during the interview at the Boston police department. The only evidence on the subject is that the trooper was carrying his service firearm on his side, unremarkable for an officer on duty interviewing an individual arrested for murder in the first degree. The defendant also maintains that at this interview he was informed that he was under arrest for a murder in Medford and he was handcuffed by a leg iron or shackle to a bar or stand. If the defendant is suggesting that the

that his statements made at the Boston police station should have been suppressed because, in violation of G. L. c. 276, § 33A, Manning provided his cellular telephone for the defendant to use rather than a police station telephone. See note 2, *supra.* This contention was not raised before the motion judge, and thus, no findings were made on the issue. The judge's findings do, however, indicate that he credited the trooper's testimony.

General Laws c. 276, § 33A, mandates that the defendant under arrest be informed of his right to use the telephone as soon as reasonably practical after arrival at a police station, and that he must be permitted to make such a call within one hour. The purpose of the statute, as stated therein, is to permit the "arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney." The statute was most recently amended by St. 1963, c. 212, prior to the existence of cellular telephone technology and the general use of cellular telephones. The Legislature therefore could not have considered the use of such telephones, and no reason has been suggested to us why we should bar their use for purposes of compliance with the statute.

There is no requirement that a defendant be permitted a private telephone call, and a defendant does not have an expectation of privacy in making such a telephone call. See *Commonwealth* v. *Garcia,* 409 Mass. 675, 686 (1991) (when telephone call is made within obvious earshot of police, defendant has no expectation of privacy). See also *Commonwealth* v. *Signorine,* 404 Mass. 400, 409 (1989). Suppression is not required unless there is a showing that the police intentionally denied the defendant this right. *Commonwealth* v. *Diaz,* 453 Mass. 266, 282 (2009).

situation was one in which his will was overborne, the motion judge found otherwise and his finding is supported by the evidence.

[6]The defendant further contends that the original warnings given to him when he was arrested did not include the "basic Miranda right to have counsel present before any questioning took place." The motion judge found that the Miranda warnings were "properly administered at all relevant times: when the defendant was arrested, twice at the Boston 'courtesy' booking . . . ." His findings are supported by the evidence. In any event, even if the Miranda warnings were not properly administered when the defendant was arrested, no questioning occurred at that time, and the judge found that the Miranda warnings were again provided to the defendant at the Boston police station before any questioning occurred.

The only apparent difference between using a land line telephone in these circumstances and using a cellular telephone is that the number dialed is automatically recorded on the latter instrument. Given that we have held that the police may record the telephone number called by the defendant if he is using a police department telephone, see *Commonwealth* v. *White*, 422 Mass. 487, 500 (1996), this difference has no significance. Moreover, Manning permitted the defendant to make three telephone calls, one of which resulted in an attorney being contacted. Thus, the police gave full effect to the purpose of the statute. Finally, the defendant has made no showing that the police intentionally violated his right in this regard.[7,8]

3. *"MySpace" computer message.* At trial, Noyes testified to the content of messages she received at her account at MySpace, a social networking Web site, from a person she testified was the defendant's brother. After this testimony was admitted without objection, the defendant moved to strike it. The trial judge denied the motion and denied a motion for mistrial related to the same issue.[9] On appeal, the defendant maintains that the judge should have struck the testimony because the messages were not properly authenticated and were hearsay. He claims also that the judge's failure to strike Noyes's testimony on the subject constitutes reversible error. He states further that the messages should have been provided to him in discovery and that, because their delayed disclosure until the trial had begun prejudiced him, the judge erred by denying his motion for mistrial on this ground as well. He argues also that his attorney's failure to object to the messages on hearsay grounds constitutes ineffective assistance of counsel. The Commonwealth asserts that the messages were

---

[7]There is no suggestion in the record that the defendant was not informed of the right to make a telephone call within the statutory time.

[8]The defendant contends that his statements made at the Medford police station later in the morning were "tainted by the illegality" of the prior statements he had made and therefore should have been suppressed. He notes correctly that "a statement made following the violation of a suspect's Miranda rights is tainted," and the prosecution must "show more than the belated administration of Miranda warnings in order to dispel the taint." *Commonwealth* v. *Osachuk*, 418 Mass. 229, 237 (1994), quoting *Commonwealth* v. *Smith*, 412 Mass. 823, 836 (1992). The problem with the defendant's argument here is that there was no prior illegality, and consequently no taint.

[9]The trial judge did refuse to admit a printout of the messages.

adequately authenticated and that they were being offered only to explain why Noyes appeared reluctant to testify and why she may have feigned a lack of memory.

As stated, Noyes was the girl friend of Powell, and the defendant spent the evening of the murder socializing with Noyes and Powell. Noyes testified to some of the defendant's "direct connect" cellular telephone conversations with the victim. She stated also that the defendant pulled out a gun and displayed it to Powell, that he left the apartment with Powell and returned shortly thereafter, and that he took "a lot of money" from his pocket.

On the fourth day of the trial, Noyes testified that the defendant's brother had contacted her four times on her MySpace account between February 9, 2007, and February 12, 2007, urging her not to testify against the defendant or to claim a lack of memory about the events at her apartment the night of the murder. Noyes printed the messages from her MySpace account at the court house on the morning of her testimony. The prosecutor provided them to defense counsel immediately after she received them from Noyes.

a. *Authentication.* The defendant's authentication argument is based on his claim that the Commonwealth did not "prove . . . that the source of the alleged [MySpace] messages was Jesse Williams [the defendant's brother]." An item offered in evidence must be "what its proponent represents it to be." *Commonwealth v. Nardi*, 452 Mass. 379, 396 (2008), quoting *Commonwealth v. LaCorte*, 373 Mass. 700, 704 (1977). Authenticity is usually proved by testimony of a witness either "(1) that the thing is what its proponent represents it to be, or (2) that circumstances exist which imply that the thing is what its proponent represents it to be." *Id.*

Noyes testified that Williams was the defendant's brother, that he had a picture of himself on his Myspace account, and that his MySpace name was "doit4it." She testified that she had received the messages at issue from Williams, and the document (which had been marked for identification) indicated that those messages were in fact sent by the user with the screen name "doit4it" and bore a picture of Williams. Noyes testified that she responded to three of the messages, and that he sent

communications back to her; she did not respond to the fourth message. The contents of the messages demonstrate that the sender was familiar with Noyes and the pending criminal cases against the defendant and desired to keep her from testifying.

There was insufficient evidence to authenticate the messages and they should not have been admitted. Although it appears that the sender of the messages was using Williams's MySpace Web "page," there is no testimony (from Noyes or another) regarding how secure such a Web page is, who can access a Myspace Web page, whether codes are needed for such access, etc. Analogizing a Myspace Web page to a telephone call, a witness's testimony that he or she has received an incoming call from a person claiming to be "A," without more, is insufficient evidence to admit the call as a conversation with "A." *Commonwealth* v. *Hartford*, 346 Mass. 482, 488 (1963). See also *Commonwealth* v. *Howard*, 42 Mass. App. Ct. 322, 324 (1997). Here, while the foundational testimony established that the messages were sent by someone with access to Williams's MySpace Web page, it did not identify the person who actually sent the communication. Nor was there expert testimony that no one other than Williams could communicate from that Web page. Testimony regarding the contents of the messages should not have been admitted.

An additional reason for excluding these messages is that they could have been viewed by the jury as evidence of consciousness of guilt. There was no basis for the jury to conclude that the statements were generated, adopted, or ratified by the defendant or, indeed, that they had any connection to him. Thus, the messages are irrelevant to consciousness of guilt and their admission was prejudicial to the defendant. *Commonwealth* v. *Cobb*, 374 Mass. 514, 521 (1978).

We consider whether the error permitting the jury's consideration of the improperly admitted messages created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Raymond*, 424 Mass. 382, 388 (1997). The content of the messages (suggesting that Noyes not testify or forget what happened) was, in our view, rendered insignificant by the testimony of two witnesses to the murder who identified the defendant as the shooter, and the corroborative testimony of those who were

with the defendant and Powell at Noyes's apartment. This evidence was strengthened by the defendant's inconsistent accounts of his whereabouts on the night of the murder and his activities thereafter. Given this testimony, the admission of the improperly authenticated contents of the MySpace messages did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Johnson*, 429 Mass. 745, 749-750 (1999).

The defendant claims that his counsel was ineffective for failing to object to the MySpace messages on hearsay grounds. Because we have already determined that admission of the messages did not create a substantial likelihood of a miscarriage of justice, the defendant's claim of ineffective assistance of counsel likewise fails. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

b. *Delayed discovery.* The defendant alleges that the late disclosure of the MySpace messages (on the fourth day of trial) violated the Commonwealth's discovery obligations pursuant to Mass. R. Crim. P. 14 (a) (1) (A) (vii), as amended, 444 Mass. 1501 (2005) (prosecution must provide defendant with "material and relevant . . . [intended] exhibits"), and that the trial judge erred in denying his motion for a mistrial on this basis. He claims that the late disclosure prevented him from investigating and presenting expert evidence regarding the "structure" of MySpace and from demonstrating the absence of proof that Williams was the source of the messages.

However, Noyes did not have access to the Internet at home and was unable to retrieve the messages until she was present at the court house. Accordingly, the contents of the messages were not in the possession of the Commonwealth until Noyes produced them for the Commonwealth at trial. They were then immediately provided to defense counsel.[10]

The Commonwealth's responsibility to provide discovery to the defendant extends to material in its possession, custody, or control, and includes information in the possession of persons

---

[10]Noyes did inform the Commonwealth prior to trial that the defendant's brother had "contacted" her, and the prosecutor informed defense counsel that the defendant's relatives had been communicating with witnesses in the case. The record does not indicate why the prosecutor did not then press Noyes for specifics regarding the communications.

who have participated in the investigation or evaluation of the case and who report to the prosecutor's office concerning the case. See *Commonwealth* v. *Bing Sial Liang*, 434 Mass. 131, 135-136 (2001). The Commonwealth was not in possession of the messages until June 5, 2007, when Noyes retrieved them from the Internet at the court house. Nor was Noyes an investigator or person working with the prosecutor's office. Noyes appeared at trial pursuant to a summons and apparently was not easily available to the Commonwealth. Furthermore, even giving the defendant the benefit of the doubt that he could have obtained evidence refuting or explaining the messages, any delayed disclosure was not meaningful in view of our conclusion that admission of the messages did not create a substantial likelihood of a miscarriage of justice.

4. *Admission of firearm.* The defendant claims that the trial judge should not have admitted, over his objection, a firearm found on his cousin's person five days after the murder. He argues that the weapon was not sufficiently linked to the killing. The decision to admit the weapon is in the discretion of the judge and will not be reversed absent palpable error. *Commonwealth* v. *Ashman*, 430 Mass. 736, 744 (2000).

Powell identified the weapon, which was seized from the defendant's cousin and brought to court, as the same weapon the defendant had drawn from his waistband at Noyes's apartment on the night of the murder. The weapon was individualized because, when the defendant showed it to Powell at Noyes's apartment, it had an unusual defect: the cylinder had to be manually rotated after each shot. The weapon admitted at trial had the same defect. Shortly after displaying that weapon to Powell, the defendant took the gun with him to the murder scene and shot the victim. Just after the shooting, Powell saw the defendant holding a gun that appeared to be the same weapon that he had seen in the defendant's possession earlier that night. Powell explained also that the defendant gave the gun to his cousin the day after the murder, stating, "You can take the gun. Just don't get caught with it cause of what happened." The weapon was properly admitted.[11]

---

[11]Evidence that the defendant had the means of committing the crime is admissible even in the absence of proof that the particular instrument was the one used to commit the crime. *Commonwealth* v. *Ashman*, 430 Mass. 736, 744 (2000).

5. *Limit on cross-examination.* The defendant maintains that he was denied his common-law and constitutional right under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to examine a key witness for bias. He claims that the trial judge "preclud[ed]" his cross-examination of Gemma, a primary Commonwealth witness, regarding a Suffolk County drug case that had been dismissed prior to trial. The defendant contends also that he should have been allowed to ask specific questions of Gemma regarding a pending Suffolk County case.[12]

On direct examination, Gemma testified that he was currently being held in custody at the Nashua Street jail on charges unrelated to the instant murder case. He said also that he had received immunity from prosecution relating to the killing of the victim in the present case in return for his testimony at the defendant's trial. He stated further that the Commonwealth had not offered him any promise in return for his testimony other than the grant of immunity. During cross-examination, Gemma admitted that he had perjured himself before the grand jury and that telling the truth to that body "[d]idn't mean a thing" to him "at that time." He admitted also that he had been convicted of violent offenses, including assault and battery by means of a dangerous weapon.

When the Commonwealth objected to defense counsel's question concerning a pending Suffolk County drug charge against him (the cause of his present incarceration), the trial judge allowed the objection and refused to hear defense counsel's offer of proof. Later, after the jury were excused, the judge permitted counsel to make an offer of proof and then ruled that Gemma could be recalled and inquiry would be permitted regarding whether Gemma expected favorable treatment in regard to the pending case in return for his testimony. However, the judge refused to allow counsel to inquire concerning a second Suffolk County drug case that had been dismissed shortly before the present trial.

In accord with the trial judge's ruling, Gemma was recalled and asked whether he expected to "work out a deal" in the

---

[12]The defendant's claim here concerns two separate Suffolk County drug cases.

pending Suffolk County case in return for his testimony; whether he faced a mandatory sentence for trafficking in cocaine over twenty-eight grams in a school zone; and whether he faced "serious charges." Gemma testified that he was not expecting any "deal" and that he did not know the potential sentence he faced. We consider whether the judge improperly limited cross-examination and, if the ruling was error, whether the error was prejudicial. See *Commonwealth* v. *Moorer*, 431 Mass. 544, 546-548 (2000).

A defendant has a constitutional right to examine a witness as to bias. *Commonwealth* v. *Noeun Sok*, 439 Mass. 428, 435 (2003). Nevertheless, a judge may limit the scope of cross-examination as long as he or she does not completely bar inquiry into a relevant subject. *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 400-401 (1995). Moreover, if a witness's potential bias is made apparent to the jury, the judge may exclude other evidence on the subject as cumulative. See *Commonwealth* v. *Allison*, 434 Mass. 670, 681 (2001).

The trial judge provided counsel an opportunity to demonstrate Gemma's possible bias in favor of the Commonwealth due to the pending drug case against him. The questions posed by defense counsel (set forth above) conveyed to the jury the essence of his point, that Gemma had an incentive to curry favor with the Commonwealth and might commit perjury to serve his own ends. The excluded questions concerning the pending Suffolk case were either repetitive of those defense counsel had already put or concerned substantive details of the case not relevant to his point. There was no error.

The defendant contends also that the trial judge should have permitted counsel to inquire regarding the dismissed Suffolk County drug charges. The Commonwealth maintains that the defendant did not provide any basis for making such an inquiry. See *Commonwealth* v. *Johnson*, 431 Mass. 535, 538 (2000) (defendant must make plausible showing to support claim of bias). In an offer of proof, defense counsel stated that the proceeding in question involved a drug charge, that "they took drugs, cell phones and things off [Gemma]," and that the case had been dismissed but that Gemma's money had not been returned to him. Defense counsel stated also that the dismissal was in May, 2007, the month before the instant trial. This offer of

proof did not constitute a threshold showing sufficient to suggest that Gemma received any benefit because of his cooperation with the Commonwealth or to require further inquiry into the subject. In any event, questions regarding the dismissed charges would have been cumulative of the inquiry into the pending charges. The witness's potential for bias was readily apparent to the jury, see *Commonwealth* v. *Rodwell*, 394 Mass. 694, 700 (1985), and the judge did not abuse his discretion in excluding further testimony thereon.

6. *Judicial bias.* The defendant asserts that the trial judge demonstrated bias against him in the following respects. First, when a member of the venire stated that she believed that the defendant was a "victim of the way we haven't served him," the judge responded, "Well, you're biased, but of course there's someone else that wasn't served and he's dead." The second claim of bias is the judge's refusal to hear defense counsel at sidebar regarding the scope of his intended cross-examination of Gemma until the witness was excused. Both claims are without merit.

A judge must of course be impartial. *Commonwealth* v. *Mills*, 436 Mass. 387, 401 (2002). However, there has been no showing of partiality. The trial judge's comment to the juror did not demonstrate prejudice against the defendant. While the remark was not appropriate, it was made outside of the presence of the jury and the potential juror to whom it was addressed was excused by the judge and not ultimately seated on the jury.

In regard to the offer of proof, although the trial judge initially refused to hear it, he did permit defense counsel to make such an offer after the witness was excused and then the judge allowed the witness to be recalled. The initial colloquy may have exhibited some shortness with counsel on the judge's part, but that was based on his belief that counsel was violating his rule that discussions with the judge not take place in front of the jury. In any event, the judge ultimately permitted the offer of proof and then reversed his ruling and permitted the requested inquiry to proceed. This one exchange and the prior remark to the juror do not "display a deep-seated favoritism or antagonism that would make fair judgment impossible." See *Liteky* v. *United States*, 510 U.S. 540, 555-556 (1994).

7. *Sentences.* As the Commonwealth concedes, the trial judge exceeded the statutory maximum by one day in each of two of the defendant's sentences. The statutory maximum for assault with intent to murder is ten years, see G. L. c. 265, § 15, and the judge sentenced the defendant to from ten years to ten years and one day. The statutory maximum for assault with a dangerous weapon is five years, see G. L. c. 265, § 15B, and the judge sentenced the defendant to from five years to five years and one day on that charge. Those sentences are vacated, and those cases are remanded for resentencing. See *Commonwealth* v. *Woodward*, 427 Mass. 659, 683 (1998).

8. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record and have considered all the issues on appeal. Though not raised by the defendant, we have considered, and rejected, the possibility that the erroneous admission of the MySpace message might have encouraged the jury to assume a consciousness of guilt on the defendant's part, thus creating a substantial likelihood of a miscarriage of justice. There is no reason to order a new trial or reduce the defendant's murder conviction to a lesser degree of guilt.

9. *Conclusion.* The defendant's convictions are affirmed. The sentences on the charges of assault with intent to murder and assault with a dangerous weapon are vacated, and those cases are remanded for resentencing.

*So ordered.*