GRIFFIS, P.J.,
for the Court:
¶ 1. Scott D. Smith was convicted of capital murder for the death of seventeen-month-old Ally Waldrop. On appeal, Smith raises two evidentiary issues. First, Smith argues that the trial court erred in the admission of several Facebook messages. Second, Smith argues that the testimony of an investigator violated the Confrontation Clause. We find no reversible error and affirm.
*994 FACTS
¶2. Smith and Jenny Waldrop were married on April 16, 2010. Waldrop had two children from a previous relationship, Ethan and Ally.
¶ 3. Waldrop worked at a local Subway. Because they only had one vehicle, Smith drove Waldrop to and from work. Smith would take care of Ethan and Ally while Waldrop was at work.
¶ 4. On May 28, 2010, the family went to wash clothes early in the day. Waldrop testified that she got into a disagreement with Smith because Ally was thirsty. Later, Smith took Waldrop to work at 4:00 p.m. Ethan and Ally were with him in the car.
¶ 5. Around 8:00 or 8:30 that evening, Smith called Waldrop and told her that Ethan had hit Ally on the head with an iron. Smith called again around 9:00 p.m. and told Waldrop that Ethan had hit Ally again and pushed her in the chest. Smith also said that Ally had then fallen against a wall. Smith told Waldrop he had called Wayne General Hospital, and he was told to just keep an eye on Ally. Smith told Waldrop that he had also called his Aunt Marcella, who was a nurse. Aunt Marcella said she would send her friend, who was also a nurse, to the house to check on Ally. 'Waldrop testified that Smith called her again around 9:30 p.m. and told her that the nurse had checked on Ally, and she was fine.
¶ 6. Waldrop got off work around 10:00 p.m. Smith did not come to pick her up. Waldrop called Smith, and .he said the car was broken down. Smith assured Wal-drop that he would be there to pick her up.
¶ 7. Waldrop testified that the children were not in the. car when Smith finally came to pick her up. Waldrop testified that Smith told her that he had already put the children to bed. As soon as they got home, Waldrop went to check on the children. She found that Ally was not breathing, her eyes were half shut, and she had a large knot on her head.
¶ 8. In his interview with police, Smith said that the children were with him when he went to pick up Waldrop. Smith also said that Waldrop brought .the children inside the house, and Smith remained outside to make a phone call.
¶ 9. Waldrop also testified that Smith had said to her that he felt it would be better if it was just the three of them— Ethan, Waldrop, and Smith. He also expressed to her it would be better if she made arrangements for someone else to take care of Ally for a while. Waldrop testified she had asked Paula Chafin if she would watch Ally while she worked. Wal-drop testified that Smith did not want Ally to live with them.
' ¶ 10. During Waldrop’s testimony, the State offered evidence of Facebook messages between Smith and Waldrop. The printed copy of an email notification, from Facebook, contained a Facebook message from Smith’s account to Waldrop’s account, and was admitted into evidence. There were also printed copies of two other Facebook messages, between Smith’s and Waldrop’s accounts, that were admitted. Waldrop identified the messages and said the second message was authored by her. The Facebook messages read:[1]
From Scott Smith: I’m so tired of fighting about the same damn thing day in and day out __moments of the day. [I] love -you [I] really do but [I] a, beyond tired, [I] am _ tired of the *995 drama, [I] am getting to where [I] just feel broken, [I] know we_long week, but please for the love of God call southwest planning and _ daycare. [I] really just can’t take anymore of this. [W]e can’t even have a_night, and you already know [I]’m going to be irritable tomorrow (monda _ because [I]’m going to have to hear the same ol s[* ⅜ ⅜] on top of the damn screaming. Jenny Waldrop: Maybe if you took some of all that love you been giving to you mom an_ some to me. [L]ife would be simple. I told you [I’]m tired of fighting and be_blamed for Ally. I want to be happy dammit I deserve that cause [I’]m not _ about Ally crying for no reason. I just wanted what [I] got last night and _- and even have that and do you know how bad that hurts me. I just wish yo_ wouldn’t expect so much out of me or get so mad easy. I really don’t k__ what to tell you anymore cause [I’]m done with the whole Ally deal I wan ___ happy if you want to keep on with it I don’t know what to tell you hone _leave me out of it.
The printed email notification from Face-book that contained a Facebook message from Smith’s account says:
Scott Smith: [I] have been trying to show you yeah [I]’m feeling a lot and [I] can’t understand all of it but [I]’m trying, hell my head is cloudy and [I] know what [I] want from you and we had part of a good night last night. [I] was really happy. [I]’m just done with everything else, the little petty bulls[* * *] trifling people are trying to pull, [I] feel my temper building and [I] know [I] will hurt someone, they are playing with fire and have no clue. [I]’m way over the screaming and crying and yes you do make it worse, its lOOOx times worse when you are around cause she knows you will put up with it or pick her up and baby her. [P]lus you always make an excuse for her crying, when there is no excuse to be made. [Y]ou see [I] told you before we got married [I] was worried about being a good father and a good husband. [Wjell you know what [I]’m going to do just that [I] know damn well [I]’m a good guy a good father and a good husband, when we are not fighting over bulls[* * *] our marriage is fine. [I]’m going to have a happy family and nothing nor no one will stand in the way of that. [I] love you don’t forget that.
¶ 11. Sara Gardner, the manager of the Subway where Waldrop worked, testified that she saw Smith and the children when they dropped Waldrop off for work. Gardner testified that, on May 21, 2010, she noticed the left side of Ally’s face was bruised. When Gardner asked Waldrop what happened, Waldrop told her that Smith had told Waldrop that Ally had fallen down the steps. After May 21, 2010, Gardner said she observed other bruises' on Ally’s arms and legs. Gardner also admitted that she was a previously convicted felon.
¶ 12. Kala Odom testified that she too was employed at Subway. Odom testified that she worked on May 28, 2010, and that she clocked out at 10:00 p.m. Odom testified she and Waldrop walked out around 10:10 p.m. Waldrop’s husband usually picked her up, and he sometimes had the children. However, Odom testified that Smith did not have the children with him when he picked Waldrop up on May 28. Odom testified that Gardner helped her word the statement that she gave to the police because she did not know how to say it. However, Odom testified it was the truth that Smith did not have the children on May 28 when he picked up Waldrop.
*996 ¶ 13. Jennifer Williams, a registered nurse at Wayne General Hospital, testified she received a call around 8:00 p.m. on May 28 from a woman with a very deep voice. The caller said that her son had hit her daughter in the head with an iron. The caller wanted to know if the child should be brought to the hospital. Williams testified she told the caller she could not offer a diagnosis over the phone, but she would be happy to check the child out in the emergency room. Williams also testified that, around 10:00 or 10:30 that same evening, she received a patient in the emergency room. The patient was a year or a year and a half old, and the patient was cyanotic, bluish, pale, and not breathing. Williams testified the child had various stages of bruising in different places. She noted that there were several bruises on the child’s head.
¶ 14. Matt Lee, an EMT paramedic with Wayne County Hospital, testified that on May 28, 2010, he responded to 914 Wayne Street at 10:21. Lee then attempted to intubate the patient but was not able to because the scene became unsafe. Lee testified that Smith used vulgar language and questioned why they were not at the hospital yet. Lee testified that the woman at the house told him the patient had been struck in the head with an iron by a sibling. The woman told Lee that a nurse had checked on the child. The woman also told him that she laid the patient down and later found the patient not breathing.
¶ 15. Officer Wesley Waites, of the Waynesboro Police Department, testified that he received a call from central dispatch shortly after 10:00 p.m. the night of May 28, 2010. He. was informed a seventeen-month-old child was. deceased at the Wayne General emergency room. Officer Waites identified the child was Ally. Officer Waites testified the first thing he did was view the body of the deceased child. Officer Waites said Ally’s body had numerous bruises, and one bruise on the back of her head was soft and spongy. Officer Waites testified that after he viewed the body of the child, he suspected that criminal child abuse had caused her death.
¶ 16. Officer Waites talked to Smith. Smith told him his version of events. Officer Waites said that Smith told him he took the children with him to pick up Waldrop. Officer Waites testified that he thought Smith’s version of the events seemed peculiar because the injury seemed severe. Officer Waites also testified that he noticed that Smith’s eyes were red and that he could smell a slight odor of alcohol. Officer Waites asked Smith if he had consumed alcohol that night, and Smith told him no. Officer Waites also asked Smith to give a blood sample, and Smith refused. Officer Waites returned around 6:00 a.m. with a warrant, and he obtained the blood sample after it was drawn by Williams.
¶ 17. Officer Waites and Investigator Chris Harris interviewed Smith again on May 29, 2010. The interview was videotaped and admitted into evidence.
¶ 18. Officer Waites also testified that Waldrop gave him copies of Faeebook messages she had with Smith. Officer Waites testified it was his understanding from the messages that Smith did not get along with Ally very well. Officer Waites also testified that he did not confirm the server ID of the computers that sent and received the messages. Officer Waites testified he did not confirm the email addresses associated with the messages were accurate. Officer Waites testified his only proof that the documents came from Wal-drop and Smith was that Waldrop said they did.
¶ 19. Officer Waites went to Smith and Waldrop’s home. Officer Waites testified that he did not see any indication that *997 someone had bled or been pushed into any walls. Officer Waites testified he recovered an iron from on top of the washing machine. Officer Waites also testified he did not see any blood on the iron. Officer Waites then testified that the crime lab had said no fingerprints were found on the iron. Officer Waites testified it was possible for a fingerprint to be destroyed if it was disturbed, but if it was left undisturbed, the print could .remain there indefinitely.
¶20. Terri Nettles, a friend of Wal-drop, testified that she was around Smith at a birthday party for Ethan. Nettles said that Smith told her that “they would probably be better if Ally would just quit screaming and crying.” Nettles, however, testified that she observed Smith around Ethan and Ally, and their interaction was really good.
¶ 21. Shan Hales was the chief of toxicology at the Mississippi Crime Laboratory. Hales testified the lab performed an alcohol analysis and a drug screen on Smith’s blood. He testified it was possible that Smith’s blood-alcohol concentration would have been significantly higher a number of hours earlier. However, he acknowledged that there was individual variation when it came to the rate of elimination.
¶ 22. Dr. Adele Lewis, a forensic pathologist, performed the autopsy on Ally. Dr. Lewis testified that she observed multiple injuries to Ally’s head, face, behind her ears, chest, upper thigh, and vagina. Dr. Lewis stated that many of the injuries occurred within six to twelve hours of Ally’s death. Dr. Lewis testified that photographs were taken of these injuries. She identified the photographs, which were admitted into evidence.
¶ 23. Dr. Lewis testified that the internal examination revealed that Ally had multiple bruises underneath her scalp and multiple fractures of her skull. There was also bleeding on her brain, some bleeding behind her eyes, and injuries to her brain. Dr. Lewis testified that it would take a great deal of force to produce that kind of injury. She also testified it was not medically possible for a two-and-a-half or three-year-old child to inflict those kinds of injuries. Dr. Lewis also testified that falling backwards four to six inches would not generate enough force to inflict this sort of injury. Furthermore, she stated that a three-year-old child simply could not wield an iron with enough force to inflict that sort of injury. Dr. Lewis finally testified that the cause of Ally’s death was blunt-force injury to the head. She testified that the other bruises and severe injuries to Ally’s head were significant to the manner of her death. They show that many of the injuries were not accidental in nature and appeared to be inflicted.
¶ 24. The jury convicted Smith of capital murder, in violation of Mississippi Code Annotated section 97 — 8—19(2)(f). The Circuit Court of Wayne County, Mississippi, entered a judgment of conviction and sentenced Smith to serve a life sentence in the custody of the Mississippi Department of Corrections without the possibility of parole, under Mississippi Code Annotated section 97-3-21 (Rev.2006). It is from this judgment that Smith now appeals.
STANDARD OF REVIEW
¶ 25. This Court reviews a circuit judge’s decision to admit or exclude evidence under an abuse-of-discretion standard. Graves v. State, 492 So.2d 562, 565 (Miss.1986).
ANALYSIS

I. Whether the trial court erred when it admitted the Facebook messages into evidence.

¶26. In this issue, Smith argues that the trial court should not have admit *998 ted the Facebook messages. He claims that the messages were not authenticated and were hearsay.
¶ 27. Facebook is a fairly new, yet commonly used technology. We begin with a brief discussion about how Facebook works.
¶ 28. Facebook is a social media site that allows its members to create profiles.[2] Each profile is protected by a password. The profiles often contain personal information and pictures. Members can also post status updates that describe their current thoughts or activities. Members can interact with one another in various ways. A member can “like” another member’s status update, write on another member’s “wall,” or send that member a private message through the Facebook site.
¶ 29. If Facebook account settings are set to such a feature, Facebook notifies its members through email whenever a member interacts with another member. For example, when one member sends another member a message on Facebook, Face-book automatically sends the receiving member an email to that member’s separate email account that informs him or her of the receipt of a message on Facebook. The email also shows him or her the message received.

A. Whether the Facebook messages were inadmissible because they were not properly authenticated.

¶ 30. Smith claims that the messages were not properly authenticated. Mississippi Rule of Evidence 901(a) provides that “[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” Section 901(b) then illustrates various ways to authenticate evidence. For example, evidence may be authenticated by distinctive characteristics. M.R.E. 901(b)(4). The comment to Mississippi Rule of Evidence 901(b)(4) says “[l]etters or phone conversations disclosing knowledge peculiar to an individual may qualify....” Evidence can also be authenticated if a witness with knowledge provides “testimony that a matter is what it is claimed to be.” M.R.E. 901(b)(1).
¶ 31. Mississippi’s appellate courts have not specifically addressed the issue of authentication of Facebook messages. However, this Court has addressed a similar authentication issue regarding emails in Kearley v. State, 843 So.2d 66 (Miss.Ct.App.2003).
¶ 32. Kearley sent several explicit emails to a young girl named Tina. Id. at 68 (¶ 5). Kearley argued the email messages had not been properly authenticated. Id. at 70 (¶ 17). Tina testified that she received on her computer the emails that were sent by Kearley. Id. at (¶ 19). Also, an officer testified that Kearley admitted he sent the emails. Id. The trial court admitted the emails into evidence and found that “the witness had vouched for the accuracy of the email printouts.” Id. This Court affirmed the trial court’s decision. Id. at (¶ 20).
¶ 33. Other jurisdictions have addressed the issue of authentication of Facebook messages. In State v. Eleck, 130 Conn.App. 632, 23 A.3d 818 (2011), defense counsel offered into evidence printed copies of messages that the defendant received in his Facebook account to impeach one of the state’s witnesses. Id. at 820. To authenticate the printed copies, the defendant testified that he printed the messages directly from his computer. Id. at 821. Furthermore, he recognized that the username of the account that sent the *999 messages was the one that belonged to the purported sender. Id. Also, he testified that the profile of the account that sent him the messages had pictures and other entries that identified the purported sender as the account holder. Id. The defendant testified that the Facebook account he claimed belonged to the state’s witness “unfriended” him after the witness testified. Id.
¶34. The state’s witness denied that she sent the messages. Id. at 820. She also said that her Facebook account had been “hacked.” Id. The trial court found the defendant had not authenticated the messages because it was not shown that the witness authored the messages. Id. at 821.
¶ 35. The Connecticut court noted that Facebook messages present unusual authentication problems because account holders often leave their computers or cell phones unattended and remain logged in to their Facebook accounts. Id. at 822. That problem is compounded by the ease with which a hacker can break into an account. Id. The court noted that previous courts have held that proof that a message came from a particular account without other authenticating evidence was inadequate to prove authorship. Id. (citing Commonwealth v. Williams, 456 Mass. 857, 926 N.E.2d 1162 (2010)); see also Com. v. Purdy, 459 Mass. 442, 945 N.E.2d 372, 381 (2011) (establishing “[ejvidence that the defendant’s name is written as the author of an email or that the electronic communication originates from an email or a social networking Web site such as Face-book or MySpace that bears the defendant’s name is not sufficient alone to authenticate the electronic communication as having been authored or sent by the defendant”).
¶ 36. The court noted that the traditional means of authentication could also apply to electronic documents. Eleck, 130 Conn.App. 632, 23 A.3d at 823. For example, “the direct testimony of the purported author or circumstantial evidence of ‘distinctive characteristics’ in the document that identify the author” are methods that may be used to authenticate electronic evidence. Id. (citing ConmCode Evid. § 9-1(a), commentary). The court held that proof that the witness managed and held the Facebook account was not enough. Id. at 824. The court held the defendant had to offer other evidence to authenticate the messages were authored by the witness and not simply sent from her Facebook account. Id.
¶ 37. Here, the Facebook messages were authenticated by Waldrop. The following exchange occurred in Waldrop’s testimony:
Q. Jenny, I’m going to. show you copies of three documents, and I want you to look at these and tell me if you can identify what they are.
A. It’s my Facebook messages.
Q. It’s Page 1 — it’s three pages. What is the second page?
A. It’s my Facebook letter to him.
Q. And?
A. His Facebook letter to me.
Q. So the first short one—
A. [W]as his.
Q. The second one is yours. And the last one is his?
A. Yes sir.
The State then offered the messages into evidence. Smith’s counsel objected on the ground that the documents were hearsay within hearsay and had not been properly authenticated.
¶38. Waldrop’s testimony was that these documents are the Facebook messages between her and Smith. Indeed, Waldrop’s 'testimony “supportfe] a finding *1000 that the matter in question is what its proponent claims.” M.R.E. 901(a) & (b)(1). Looking at the decisions in Kearley and Eleck, we find this case more closely relates to Kearley, where testimony was presented that established that Kearley previously admitted he authored the messages. See Kearley, 843 So.2d at 70 (¶ 19). As to this issue, we find that the Facebook messages were properly authenticated, and the circuit court did not abuse its discretion as to the authentication of the evidence.

B. Whether the Facebook messages were inadmissible as hearsay.

¶ 39. Smith argues that the Facebook messages were inadmissible as double hearsay. There were two different types of messages. One message was an email that contained the Facebook message. This was a email notification automatically sent from Facebook to Waldrop as a notification that “Scott Smith sent you a message on Facebook.” The other two messages were printouts of messages that were posted on Waldrop’s Facebook page.
¶ 40. Smith argues that the email notification was hearsay, and the statements contained in the message were also hearsay. Smith claims that these hearsay statements do not meet the exceptions of Mississippi Rule of Evidence 804(b) and should have been excluded from evidence. Smith cites no case authority to support this argument.
¶ 41. “Hearsay is not admissible except as provided by law.” M.R.E. 802. “Hearsay” is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” M.R.E. 801(c). A “statement” is defined as “(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.” M.R.E. 801(a). The “declarant” is the “person who makes [the] statement.” M.R.E. 801(b). “Hearsay included within hearsay is not excluded under the hearsay .rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.” M.R.E. 805.
¶ 42. This requires a two-part analysis. First, we must consider whether the email notification from Facebook was hearsay. Second, we must consider whether the content of the messages was hearsay.
¶ 43. The email notification can be resolved in short order. A “statement” has two elements. It must be an “assertion,” and it must be made by a human. M.R.E. 801(a). The email notification was an automatic feature of Facebook. The email notification was a fully automatic process. There was no “assertion,” there was no “declarant,” and the statement was not made by a human. Therefore, the automatic email notification from Face-book may not be considered as hearsay.
¶ 44. Likewise, the printouts of the messages are not hearsay. Facebook’s automatic notification features, which cause the messages to be sent within Facebook and sent via email notification, are not statements. Hence, the email notification and the sending of a message within Face-book are not to be considered as hearsay.
¶ 45. There is no Mississippi authority as to this issue. Recently, in In re Oil Spill by the Oil Rig “Deep Water Horizon” in the Gulf of Mexico, 2012 WL 85447, at *4 (E.D.La. Jan.11, 2012), a Louisiana federal court determined that a forwarded email constituted double hearsay. The court reasoned that “not only is the email itself offered for the truth of its contents, and thus hearsay, but also many of the statements within a given email are hearsay.” Id. The court noted that when someone forwards an email, he or she has *1001 made an out-of-eourt assertion as to what someone else said. Id. There, however, a person forwarded the message. Thus, there was an assertion and a declarant. Here, an automatic process sent each message. As a result, in this case there was neither an assertion nor a declarant. The email notification, which contained the Fa-cebook message, is not within the definition of hearsay.
¶46. Next, we consider whether the content of the messages would be considered to be hearsay and, thus, inadmissible under Rule 802.
¶ 47. Two of the three messages were sent by Smith. These messages were Smith’s own statements, and both statements are therefore not hearsay under Mississippi Rule of Evidence 801(d)(2)(A), because they are admissions by a party-opponent. The content of the messages sent by Smith are not hearsay, as defined by the rule, and were admissible in evidence.
¶ 48. Waldrop’s message to Smith could be hearsay. The State has offered no hearsay exception that this message would fall under. Nevertheless, we note that any error in the admission of Wal-drop’s Facebook message could only be considered harmless error.
¶ 49. Errors in the admission of evidence are subject to a harmless-error analysis because, as is often said, a defendant is entitled to a fair trial, not a perfect one. Conners v. State, 92 So.3d 676, 688 (¶ 33) (Miss.2012) (citing Brown v. United States, 411 U.S. 223, 231-32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973)). An error is harmless when “the same result would have been reached had it not existed.” Pitchford v. State, 45 So.3d 216, 235 (¶ 71) (Miss.2010). We review the record de novo to determine the error’s effect. Richardson v. State, 74 So.3d 317, 328 (¶ 37) (Miss.2011).
¶ 50. Here; Waldrop appeared and testified as to the same matters that were included in the Facebook message. Smith was convicted of capital murder. Smith was indicted under Mississippi Code Annotated section 97—3—19(2)(f) (Rev.2006), which provides:
The killing of a human being without the authority of law by any means or in any manner shall be capital murder ... [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony.
Dr. Lewis testified that Smith’s version of events could not have produced the injuries Ally sustained. Waldrop testified that Smith had problems with Ally. Hales testified that Smith had alcohol in his blood. Odom testified that Smith did hot have the children when he picked Waldrop up from work. Gardner testified she had seen bruises on Ally before.
¶ 51. From this review, it is clear that there was overwhelming evidence presented, without Waldrop’s Facebook message, to sustain-Smith’s conviction. As a result, we find no reversible error as to this issue.

II. Whether the trial court erred when it allowed Officer Waites to testify about the results of the fingerprint analysis.

¶ 52. Smith also argues that the circuit court erred when it allowed Officer Waites to testify about the results of the fingerprint analysis. He claims that this violated the Confrontation Clause of the United States Constitution.
¶ 53. Officer Waites testified that “[t]he iron was processed by the crime lab for prints. And according to the Mississippi *1002 Crime Lab report, there were no fingerprints found on the iron.” Smith’s counsel objected on the grounds that “he is not competent .to testify from a hearsay statement.” Counsel further objected on the ground that he did not have a report or submission form. The court instructed the State to provide him with the submission form. The essence of this testimony was that there were no fingerprints on the iron.
¶ 54.' During closing argument, the State argued that no fingerprints were found on the iron and that, if the defense had wanted to test the iron, they had the opportunity. The defense objected and said the State had commented on what may or may not be on the iron, and that was improper.
¶ 55. The supreme court has said “[a]s a general rule, constitutional questions not asserted at the trial level are deemed waived.” Williams v. State, 971 So.2d 581, 590 (¶ 29) (Miss.2007). Smith’s counsel did not object on confrontation grounds. Thus, the trial court never had the opportunity to rule on this issue. As such, this issue is procedurally barred.
¶ 56. The plain-error doctrine allows this Court “to address an issue not raise at trial if the record shows that error did occur and the substantive rights of the accused were violated.” Byrom v. State, 863 So.2d 836, 872 (¶ 121) (Miss.2003). Only an error that affects the defendant’s substantial rights rises to the level of plain error. Taylor v. State, 754 So.2d 598, 603 (¶ 11) (Miss.Ct.App.2000) (citation omitted). “To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial.” Cox v. State, 793 So.2d 591, 597 (¶22) (Miss.2001) (citations omitted).
¶ 57. A Confrontation Clause violation is a “fundamental, substantive right” violation. Conners, 92 So.3d at 682 (¶ 15). The United States Supreme Court addressed the implications of the Confrontation Clause on forensic evidence in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). The Court wrote that the Sixth Amendment provides a defendant with the right “to be confronted with the witnesses against him.” Id. at 314, 129 S.Ct. 2527. The Court determined that affidavits of analysts’ reports from a forensic laboratory were testimony. Id. at 311, 129 S.Ct. 2527. As such, the petitioner’s Confrontation Clause right was violated unless there was evidence that “the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them....” Id.
¶ 58. Here, the analyst that performed the fingerprint analysis did not testify. Instead, Officer Waites testified that the crime lab did not find fingerprints on the iron. Officer Waites’s testimony was that there was an absence of such evidence. Smith argues on appeal that Officer Waites’s testimony about the absence of fingerprints was used to challenge Smith’s story that another child beat the deceased child with an iron. Interestingly, in closing argument, Smith’s counsel commented upon the lack of scientific evidence from the “instrument used to kill the child.... Where is it? ... Why isn’t it here?”
¶ 59. Regardless, “Confrontation Clause violations are subject to harmless-error analysis.” Conners, 92 So.3d at 684 (¶ 20). As stated above, an error is harmless when “the same result would have been reached had it not existed.” Pitchford, 45 So.3d at 235 (¶ 71). We review the record de novo to determine the er *1003 ror’s effect. Richardson, 74 So.3d at 328 (¶ 37).
¶ 60. Officer Waites’s testimony about the lack of fingerprints on the iron was not important testimony. It was neither exculpatory nor inculpatory evidence. There was overwhelming evidence presented, without Officer Waites’s fingerprint testimony, to sustain Smith’s conviction. Further, we do not find that the inclusion of this evidence prejudiced or interfered with Smith’s ability to present his defense or theory of the case. As a result, we find no error as to this issue.
¶ 61. Finding no merit to the issues raised by Smith, we affirm the conviction.
¶ 62.. THE JUDGMENT OF THE WAYNE COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF SUSPENSION, REDUCTION, PROBATION, PAROLE, EARNED TIME, GOOD TIME, OR ANY TYPE OF EARLY RELEASE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WAYNE COUNTY.
LEE, C.J., IRVING, P.J., ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT.

. The copies admitted into evidence omitted parts of the messages because the copier cut off a portion at the right margin. The messages are quoted but the omitted portions are identified with a blank space_

. www.facebook.com.