# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00721-COA

**DOUGLAS ALLEN TAYLOR**                                                  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                        **APPELLEE**

DATE OF JUDGMENT:            05/26/2021
TRIAL JUDGE:                 HON. LAWRENCE PAUL BOURGEOIS JR.
COURT FROM WHICH APPEALED:   HARRISON COUNTY CIRCUIT COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      GRADY MORGAN HOLDER
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: CASEY BONNER FARMER
DISTRICT ATTORNEY:           WILLIAM CROSBY PARKER
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 REVERSED AND REMANDED - 01/10/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1.     A registered sex offender was found guilty of violating state law by living within 3,000 feet of a playground at a church down the street from his home. The core proof at trial was a Google Earth map that calculated the distance from his house to the edge of the church property. After a bench trial, the man was found guilty. He subsequently appealed.

## FACTS

¶2.     In 1998, Douglas Taylor plead guilty in an Arizona federal court. While the exact crime is not specified in our record, he does not dispute that it was related to his possession of a digital image of child sexual abuse—and that after his conviction he had to register as

a sex offender. And upon moving back to Mississippi in December 2015, Taylor complied and registered as a sex offender.

¶3. State law prohibits registered sex offenders from living within 3,000 feet of certain places like schools, childcare facilities, and playgrounds. Miss. Code Ann. § 45-33-25(4)(2) (Rev. 2015). When he moved back to the Gulf Coast, Taylor hit the radar of Sergeant Jessica Akers with the Harrison County Sheriff's Department. It was Akers' job as a sex-offender registrar to ensure that Taylor did not violate state law by living near a prohibited location.

¶4. Akers met with Taylor personally and went over the sex-offender-registration requirements. In particular, she explained the specific prohibition against living within 3,000 feet of any playground and provided Taylor with paperwork explaining the applicable laws. Taylor initialed by each requirement.

¶5. Nonetheless, the first residence Taylor chose was determined to be too close to an elementary school. Although he had already signed a one-year lease, he broke the lease and then chose another residence.

¶6. The residence he chose was 18368 Tara Brooke Drive in Gulfport. But shortly after moving to the new home and signing another year-long lease, there was another snag. Akers received a notification from the Department of Public Safety stating that Taylor had gone to the driver's license station and had registered at a new address. But Akers quickly learned the Tara Brooke address was too close to a playground located at Michael Memorial Church.

¶7. Akers notified Taylor that he had to move, or he would be in violation of the state statute. She subsequently sent a letter in February 2016 notifying him of the violation and

2

giving him fifteen days to cease violating state law.

¶8.     Akers would later testify that when she spoke with him, Taylor explained to her that he was financially strapped at the time, having already broken one lease, and he needed additional time to save money to move again.  In the end, Akers relented and gave Taylor until March 15, 2016, to find a new address.

¶9.     For some reason, Akers did not follow up on Taylor's case.  He stayed in the home despite repeated warnings he was violating state law.  Akers left her job in October of the same year.

¶10.    Months later, in February 2017, a new investigator was assigned to Taylor's case.  She later testified that she checked to see if he was registered at a new address since he had been warned he was violating state law. She soon discovered that Taylor had not moved and was still residing within 3,000 feet of the church playground.

¶11.    Shortly thereafter, Taylor was arrested.  While in custody at the sheriff's department, Taylor made a phone call to his mother.  On the call, when asked by his mother why he had been arrested, Taylor made a telling admission—he told her it was "[f]or not moving."

¶12.    Between the time he registered the address and the time of his arrest, despite the Harrison County Sheriff's Department's warning him he was in violation of state law, Taylor lived at the Tara Brooke residence for 428 days and never took action to remedy the violation.

## PROCEDURAL HISTORY

¶13.    A grand jury then indicted Taylor for violating Mississippi Code Annotated section

3

45-33-25(4)(a) by living within 3,000 feet of a playground. Taylor waived his right to a jury trial.

¶14. At the bench trial, Sergeant Akers testified she had explained to Taylor the restrictions of his residing within 3,000 feet of certain properties, including a playground. And when Akers discovered that Taylor was living too close to the playground at the church, she told the trial court she had a couple of conversations with him informing him of the violation and also sent him a letter regarding his violation. She said she had given him additional time to find a compliant address.

¶15. During Akers' testimony, the State offered into evidence a map from Google Earth. It showed a satellite image of the neighborhood where Taylor lived, including the nearby church and its playground. At the bottom of the image was a distance ruler generated by the program showing the scale of the image. The proposed exhibit also included handwritten annotations by Akers, such as Taylor's address, the address of the church, and a note that the church was "appx. 830 ft." from Taylor's residence to the edge of the church's parking lot.

¶16. Defense counsel objected to the admission of the exhibit on the ground that the document was hearsay. Specifically, defense counsel stated, "So here they are not trying to introduce an image of just a picture. This thing has handmade written notes, handmade point A to point B drawing a line. That's classic hearsay." Defense counsel further argued, "Those [calculations] are assertions and they go directly to an element of this defense . . . . And those are out of court assertions and they're not authenticated."

¶17. Defense counsel also protested that there were no "personal measurements of this

4

distance by anybody" and that the State had not introduced "testimony as to any training or things that have been done with Google Earth to ensure accurate results." Defense counsel continued, "There's been no objective test or verification of accuracy for these Google Earth images or how they were administered."

¶18. The trial court then asked the witness a series of questions about the proposed exhibit.

| | |
|---|---|
| The Court: | Who drew the lines from point A to point B? |
| Akers: | Sometimes I draw them. Sometimes it is generated. I did. |
| The Court: | You did? |
| Akers: | I did. I drew these lines. |
| The Court: | So while you got it in your hand and you have marked them what the addresses are? |
| Akers: | Yes. |
| The Court: | And you also marked something as it regards to the distance? |
| Akers: | Yes, sir. |
| The Court: | Who marked that? |
| Akers: | I did. |
| The Court: | And how did you come to that 830 feet [calculation]? |
| Akers: | Because when I drop a point here and a point here, it tells me the distance. |
| The Court: | Okay. What tells you the distance? |
| Akers: | Google Earth tells me the distance. You can pick miles, feet, however. So I did that. 830 feet approximately depending on where I drop the pin. |

¶19. Akers then conceded she had never been to the church playground or Taylor's home. When asked how she measured the 3,000 feet set by state law, she explained she "dropped" the pins on Google Earth. The program then calculated the distance in a straight line between the two points. When pressed about why she chose to place the one pin on the edge of the church's property line, she explained she used "an AG opinion that tells us that we measure from the closest property line to the closest property line in a straight shot[.]"

¶20. Akers further explained she made the hand-drawn lines on the exhibit. She testified

5

that based on Google Earth's calculation of the distance from Taylor's address to the church property, it was "830 feet approximately."

¶21.   Without explanation, the trial court overruled the hearsay objection, and the exhibit was admitted.

¶22.   Next, the investigator who handled Taylor's case after Akers left testified.  She had traveled to the church and determined there was an active playground.  Relying on the Google Earth map prepared by Akers, she also determined Taylor was violating the statute.  Depending solely on the map, she testified that the distance from Taylor's house to the edge of the church property was "approximately 830 feet."

¶23.   She also explained her office previously had used Google Earth maps.  When asked if she was aware of how the program calculated distances, she replied, "They are as the crow flies, as they say."

¶24.   Lyle Newmeier was an administrator of the church.  He told the trial court the playground at the church had been there for at least nineteen years, long before Taylor moved to the neighborhood.  When asked who was able to use the church's playground, he replied, "Anybody that really wants to . . . . While it is fenced in, that's mainly to keep the children in there while they are out there Sundays or Wednesdays."  He went on to say "[i]t is virtually open 24/7."  He testified that the neighborhood where Taylor lived had children who were allowed to use the playground.  He said, "We have families that come over all the time to play."  He also mentioned child protection services used the playground for meetings between foster families and biological families.  Newmeier acknowledged there was a lock

6

on one of the playground's gates but said the main entrance gate was not locked.

¶25. As was his right, Taylor declined to testify.

¶26. From the bench, the trial court held, "It really makes no difference whether [the playground] is public or private" since "[t]he statute specifically says public or nonpublic[.]" The court acknowledged the uncontested fact that Taylor was given additional time to move, but even after his one-year lease had expired, "[h]e was still living at the same address, [and he] apparently had taken no steps to move."

¶27. Taylor was found guilty. The trial court sentenced him to a term of five years, with three years suspended and two years to serve on house arrest under Mississippi Department of Corrections supervision, and three years of post-release supervision.

## DISCUSSION

¶28. On appeal, Taylor asserts four primary challenges. First, he argues that the statute prohibiting him from residing within 3,000 feet of a playground is unconstitutional. Second, he argues that church playgrounds are not included in the relevant statute. Third, he argues that the Google Earth map should have been excluded from the trial. Last, he argues the proof was not sufficient to show he violated the sex-offender-registry law.

### I. The sex-offender-registry law is not unconstitutionally vague.

¶29. Taylor first argues the statute banning him from living 3,000 feet by a playground is unconstitutionally vague for two reasons. First, he argues that while the statute includes the word "playground," it does not provide a specific definition of the word. In his view, "the term 'playground' can have an endless number of meanings," citing three dictionaries in

7

support. Second, Taylor protests the statute is unconstitutionally vague because it does not explain how the distance should be calculated, arguing "the statute provides no guidance or definitions on how this is measured."

¶30. "We review challenges to the constitutionality of a statute de novo." *Edwards v. State*, 294 So. 3d 671, 674-75 (¶12) (Miss. Ct. App. 2020). "A party challenging the constitutionality of a statute must prove his case by showing the unconstitutionality of the statute beyond a reasonable doubt." *Williams v. State*, 154 So. 3d 64, 67 (¶11) (Miss. Ct. App. 2014) (citation omitted). "All doubts must be resolved in favor of the validity of a statute." *Edwards v. State*, 800 So. 2d 454, 461 (¶10) (Miss. 2001).

¶31. Mississippi Code Annotated section 45-33-25(4)(a) prohibits a registered sex offender from living within 3,000 feet of "the real property comprising a public or nonpublic elementary or secondary school, a child care facility, a residential child-caring agency, . . . a children's group care home *or any playground*, ballpark or other recreational facility utilized by persons under the age of eighteen." (Emphasis added).

¶32. "[T]he void-for-vagueness doctrine requires that a penal statute define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Mohamed v. State*, 323 So. 3d 532, 552 (¶65) (Miss. Ct. App. 2021) (citation omitted). The Supreme Court has ruled that "[t]he test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Fulgham v. State*, 47 So. 3d 698, 701 (¶8) (Miss. 2010)

8

(citation and internal quotation marks omitted). In determining whether a statute is constitutionally vague, the test is "whether the statute forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Ferrell v. State*, 158 So. 3d 1204, 1212 (¶30) (Miss. Ct. App. 2015) (citation and internal quotation marks omitted).

¶33. Our review is not conducted based on imaginary problems but rather the facts of the case before us. Accordingly, the Fifth Circuit Court of Appeals has concluded that a reviewing court should "examine the complainant's conduct before analyzing other hypothetical applications of the law" because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008). As our Supreme Court has put it, if the statute at issue "implicates no constitutionally protected right, the court should consider whether the statute is impermissibly vague in all of its applications, applying the statute to the complainant's conduct before considering any hypothetical scenarios." *Fulgham*, 47 So. 3d at 702 (¶13). And "the court must consider whether the [defendant] had notice of what conduct is prohibited and whether law enforcement had definite standards to avoid arbitrary enforcement." *Id*.

### A. The word "playground" in the statute is not unconstitutionally vague.

¶34. First, Taylor argues Section 45-33-25(4)(a) is unconstitutionally vague, and "the legislature did not intend for a fenced-in playground located on church property to be included in the statute's purview." And further, "the statute fails to define the term[]

9

'playground . . . .'"

¶35. Pursuant to the statute, registered sex offenders cannot live within 3,000 feet of "*any* playground." Miss. Code Ann. § 45-33-25(4)(a) (emphasis added). Our precedent requires "a . . . statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Mohamed*, 323 So. 3d at 552 (¶65).

¶36. An ordinary person would understand a registered sex offender is prohibited from residing within 3,000 feet of a playground, whether located by a church, standing alone in a neighborhood, or otherwise. The Legislature took care to use the most expansive word it could when prohibiting sex offenders from living near playgrounds by forbidding residency by "*any* playground." Miss. Code Ann. § 45-33-25(4)(a) (emphasis added).

¶37. And under *Fulgham*, we do not need to devolve into hypotheticals to wonder exactly what combination of equipment constitutes a playground, since we are to first "apply . . . the statute to the complainant's conduct before considering any hypothetical scenarios." *Fulgham*, 47 So. 3d at 702 (¶13). Photographic proof in this case established that the playground was a fenced-in area with a brightly colored plastic play structure, which was composed of a slide, monkey bars, and a little cupola at the top. There were other pieces of playground equipment and chairs and awnings in one part of the playground. An ordinary person would see this defined area as a playground.[1]

---

[1] Taylor also complains that "[t]he statute provides no guidance on how to interpret the statute's use of the phrase 'utilized by persons under the age of eighteen (18) years.'" He then provides numerous hypothetical scenarios in which the statute could potentially apply. But as set out above, we do not need to engage in theoretical situations about whether a

¶38.   Furthermore, the statutory language of "any playground, was more than enough to warn Taylor he could not live within the prohibited zone, as the statute "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Fulgham*, 47 So. 3d at 701 (¶8).  The proof was uncontested that upon Taylor's arrival in Mississippi, he met with law enforcement to review where he was prohibited from residing as a convicted sex offender, and initialed the form.

¶39.   Therefore, we find the statute is not unconstitutionally vague.  An ordinary person would understand that "any playground" included one on church property and that the defined area in this case did indeed constitute a playground.

### B.     Distance is measured in a straight line for purposes of measuring exclusion zones for registered sex offenders.

¶40.   Taylor next argues the statute lacks any guidance or definitions on how the 3,000 feet distance in the statute is measured.  He insists "Miss. Code Ann. § 45-33-25(4)(a) does not provide sufficiently definite guidelines for registrants and law enforcement to determine from where to measure the 3,000 feet distance used to determine the exclusion zones, and neither the registrants nor law enforcement officer have the necessary data to determine the zones even if there were a consensus about how they should be measured."

¶41.   Neither this Court nor our Supreme Court has ruled on how to calculate the distance from a sex offender's residence to a playground located on church property.  Yet we do have guidance on this issue from the executive branch via an opinion from the Attorney General.

---

playground is for children or otherwise.  We find it is clear enough on the uncontested proof of this case that the playground here featured bright colors, round corners, and was scaled to accommodate people of a smaller size.

We have long held that "[a]n attorney general's opinion is entitled to careful consideration and regarded as persuasive," even though "the opinion is not binding[.]" *McGhee v. Johnson*, 868 So. 2d 1051, 1053 (¶7) (Miss. Ct. App. 2004).

¶42. Over two decades ago, the Legislature established a sex offender registry, which required those convicted of certain offenses to register their addresses and certain other information with the State. Miss. Code Ann. § 45-33-25 (Rev. 2000); *see* 2000 Miss. Laws ch. 499, §3 (S.B. 2797). Six years later, sex offenders were prohibited from residing within 1,500 feet of schools and child-care facilities; playgrounds were not yet included in the law. Miss. Code Ann. §45-33-25 (Supp. 2006); *see* 2006 Miss. Laws ch. 566, §2 (S.B. 2527). Shortly thereafter, the Legislature once again amended the statute to included "any playground" to the areas where sex offenders were prohibited from residing. Miss. Code Ann. §45-33-25 (Supp. 2008); *see* 2008 Miss. Laws ch. 424, §1 (H.B. 519). A more recent change expanded the prohibition on residency around schools, child-care facilities, and playgrounds from 1,500 feet to 3,000 feet. Miss. Code Ann. §45-33-25 (Supp. 2014); *see* 2013 Miss. Laws ch. 521, §2 (S.B. 2732).

¶43. After the statute barring sex offenders from living near schools and child-care centers went into effect, law enforcement lacked precise guidance as to how to enforce the statute. The Madison County Sheriff asked the Attorney General for guidance. Miss. Att'y Gen. Op., 2007-00243, 2007 WL 2019771, *Trowbridge* at *1 (May 18, 2007). Specifically, the sheriff asked how to measure the distance in the statute: "[d]oes [the distance] mean from the offender's front door to the property line of the school or child care facility or does it mean

12

from property line to property line?" *Id.*

¶44.    In response, the Attorney General's opinion first explained, "There is no specific statutory guidance answering your first question concerning the method of measurement of the 1,500 foot distance," pointing to the distance included in the original version of the statute. *Id.* Rather, to make this determination, "one must look to the legislative intent in its use of the word 'reside.'" *Id.* The opinion continued, "The question answered must be whether 'reside' refers only to the actual building and real property on which it is situated." *Id.* Since "the purpose of the sex offender statutes is to protect the public from these offenders," the Attorney General reasoned "the 1,500 feet measurement . . . should be from the property line closest to the school or child care facility of the real property upon which the home/building of the offender sits to the closest real property line of the school or child care facility."[2] *Id.*

¶45.    We find the opinion by the Attorney General persuasive regarding the interpretation of the entirety of the 3,000 feet prohibition, whether applied to schools, child-care facilities, or playgrounds. The proper measurement in a case involving the 3,000 feet prohibition is to measure from the closest property line of the sex offender's residence to the closest property line of the restricted area. In the case at hand, the proper measurement would be from the closest property line of Taylor's residence to the closest property line of the Michael Memorial Baptist Church. This interpretation of the statute respects the Legislature's intent

---

[2] The sheriff also inquired, "How much of a time frame should be allotted when requesting or telling the offender to move?" *Id.* The AG responded that "if the offender is violating the distance requirement he should be required to move *immediately*." *Id.* (emphasis added).

13

to safeguard those expressly listed areas where minors can reasonably be expected to congregate.

¶46.    The thoughtful separate opinion would interpret the statute differently, finding that the point measured should be only to the edge of "the playground itself." Respectfully, this interpretation ignores the core purpose of the statute: to safeguard places where there are groups of minors from registered sex offenders. The partial dissent's interpretation would shrink the zone of exclusion around those protected places, which is contrary to the clear intent of the Legislature.

¶47.    Indeed, as set out above in the statute's legislative history, over time the Legislature *expanded* the prohibited area from 1,500 to 3,000 feet. This Court cannot ignore this expressed intent and instead do the reverse by expanding the areas where registered sex offenders may reside. *See Tex. Workforce Comm'n v. United States Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (reasoning courts should implement law with "a presumption against ineffectiveness," so an "interpretation that furthers rather than obstructs the document's purpose should be favored").[3]

¶48.    In 2007, the Attorney General opined the statute was to be measured "from the property line closest to the school or child care facility of the real property upon which the

---

[3] The proposed interpretation by the concurrence could also prove to be unworkable in real world scenarios. First, it would doubtlessly lead to extensive litigation over just where the edge of a playground was located, with anecdotal testimony over where the "real" edge of a playground might be. Not every playground has a fence like the one at the church in this case. Such a method would provide law enforcement with little to no guidance on where to measure in order to enforce the statute. In contrast, the edge of the real property line can be determined by reference to admissible evidence such as a deed or tax parcel information.

14

home/building of the offender sits to the closest real property line of the school or child care facility." *Trowbridge*, 2007 WL 2019771, at *1. The statute was amended twice after the *Trowbridge* opinion was issued, first to shield "any playgrounds" and then to expand the zone to 3,000 feet. If the Legislature believed a different measurement method was warranted than the one under the Attorney General's interpretation, the Legislature could have written this approach into the law in the subsequent times the statute was amended and may still alter the language as it sees fit. *See Miss. State Univ. v. PETA*, 992 So. 2d 595, 610 (¶26) (Miss. 2008) (stating "the wisdom or folly of the pertinent legislation is strictly within the constitutional power of the Legislature").

¶49. In conclusion, we find that the word "playground" in the statute is not unconstitutionally vague. Further, those places listed in the statute are measured from the nearest real property line of the sex offender's residence to the nearest real property line of the prohibited place for purposes of determining compliance with the 3,000 feet prohibition.

> **II. The statute expressly prohibits registered sex offenders from living within 3,000 feet of "any playground," which includes playgrounds on church property.**

¶50. In his next argument, Taylor argues that because "neither churches nor nonpublic playgrounds are included in the residence restrictions," his indictment should have been dismissed. Taylor hones in on the fact that the statute lacks any language referring to churches, concluding "the unambiguous language of the statute does not prohibit registered offenders from residing within 3,000 feet of a church or other place of worship." He argues, "the legislature did not intend for the term 'playground' . . . to include a nonpublic, fenced-in,

and unobservable playground located on church property."

¶51.  We reject such a narrow interpretation of the statute. Mississippi Code Annotated section 45-33-21 (Rev. 2015) provides the Legislature's purpose in requiring sex offenders to register with the State: "[t]he Legislature finds that . . . the protection of the public from these offenders is of paramount concern and interest to government." *Id*. The Legislature further contemplated "that the system of registering criminal sex offenders . . . will provide law enforcement with additional information critical to preventing sexual victimization and to resolving promptly incidents involving sexual abuse and exploitation." *Id*.

¶52.  The Legislature's express purpose of this law was to protect minors from registered sex offenders. The statute does not limit what playgrounds are encompassed within the law—instead, the law has *no* limit, prohibiting sex offenders from living within 3,000 feet of "*any* playground." *Id*. (Emphasis added). The fact that the playground at issue was located on church property does not remove it from the protection of the statute. We reject Taylor's argument that church playgrounds are not included in the statute.

### III.  The Google Earth map was not properly authenticated and contained hearsay.

¶53.  For his third argument on appeal, Taylor argues the trial court should not have admitted a map generated by Google Earth. At trial, counsel objected to the admission on the basis of hearsay and because the proposed exhibit could not be authenticated. Taylor protests the evidence both for authentication of the Google Earth information and for the handwritten calculation on the admitted exhibit.

¶54.  Exhibit 4 was admitted at trial. The exhibit depicts a Google Earth satellite image.

16

It shows an overhead view of a residential neighborhood. There is a pin denoted as "A," which is labeled as Michael Memorial Church, and a pin labeled as "B," indicating Taylor's residence. There is a straight line drawn from point "A" to point "B." Below the Google Earth image is a ruler depicting the overall scale of the map. Beneath the image Akers wrote the following:

*A. Michael Memorial Baptist Church*

> *15053 John Clark Rd.*

*B. 18368 Tarabrooke Dr. Gulfport*

*A to B is appx. 830 ft*

*From A to the farthest point @ Tarabrooke is < 2000 ft.*

¶55. To be precise, the exhibit contains three types of information, that are intertwined. First is the image or photograph by Google Earth of the neighborhood where Taylor lived. Second is the handwriting by Sergeant Akers representing pins she had dropped on the program identifying where Taylor's home was, the location of the playground, and the estimate of the distance between the two. Last was the distance ruler generated at the bottom of the map by Google Earth and the calculation the program made of the distance between the two pins.

¶56. "The standard of review for admission of evidence is abuse of discretion." *Carter v. State*, 337 So. 3d 236, 242 (¶14) (Miss. Ct. App. 2021).

### A. The Google Earth image alone is not hearsay.

¶57. The core conflict in this case involves the admission of a map printed from Google

17

Earth. On appeal, Taylor's argument is twofold: the trial court should not have admitted Exhibit 4 into evidence because it was not properly authenticated, and it also contained hearsay.

¶58. Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." MRE 801(c)(1)-(2). And "[d]eclarant" is defined as "the *person* who made the *statement*." MRE 801(b) (emphasis added). Further, a statement is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." MRE 801(a).

¶59. The Mississippi Supreme Court has concluded that "[s]imply put, a photograph does not meet the definition of a 'statement,' so it cannot qualify as hearsay under our rules of evidence." *Walters v. State*, 206 So. 3d 524, 535 (¶31) (Miss. 2016). In that case, the Court allowed the introduction of a series of satellite photos from Google Earth's "Historical Imagery" feature. *Id*. at 534 (¶29). In allowing the exhibits, the Court cited to a case from the Ninth Circuit Court of Appeals, finding "a photograph merely depicts a scene as it existed at a particular time . . . [b]ecause a satellite image, like a photograph, makes no assertion, it isn't hearsay." *Id*. (citing *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109 (9th Cir. 2015)).

¶60. As was the case in *Walters*, we find that the Google Earth image alone was not hearsay. The image in this case makes no assertion; rather, it "merely depicts a scene as it existed at a particular time." *See Lizarraga-Tirado*, 789 F.3d at 1109. During oral argument,

counsel for Taylor acknowledged the image itself is not hearsay since it is "just a picture." This component of Exhibit 4 alone is not hearsay and was admissible.

**B. Because some of Sergeant Akers' handwritten notations are from her personal observation, they are not hearsay.**

¶61. Next, Taylor contests the admissibility of Sergeant Akers' handwritten notations on the Google Earth image. As outlined above, the Google Earth satellite image was labeled by Akers. Akers labeled point "A" as the playground at Michael Memorial Baptist Church, and then drew a straight line to what she labeled as point "B," Taylor's home. And as illustrated above, she also made handwritten notations under the image. The right side of the document contains the date on which the notes were written followed by Sergeant Akers' initials.

¶62. When asked by the trial court who drew the lines on the Google Earth image, Akers replied, "I drew these lines." She also testified she had made all of the handwritten notations, which is evident by her initials and date written on the image. Yet in contrast to Akers' decision to manually drop the pins on what she perceived to be her personal identification of where Taylor resided and the playground, she did not make the calculation herself. Instead, she testified that the distance of 830 feet was calculated by the Google Earth program.

¶63. We find that some of Akers' handwritten notations written on the Google Earth image are not hearsay because she testified to the notations personally at trial. Specifically, her determination of the location of the church and Taylor's residence was not hearsay. Since she was not an out-of-court declarant but present for the purposes of trial, these notations

19

were not hearsay. *See* MRE 801(c)(1). We address the calculations made by the program below.

### C. The ruler and distance calculated by Google Earth are hearsay and were not properly authenticated.

¶64. The third layer of information on Exhibit 4 was the program's calculation between the two dropped pins and the distance ruler at the bottom. On appeal, Taylor argues Google Earth's calculation of the distance between his house and the playground was not supported by personal observation, as no one personally measured the distance or could verify the measurement, and the distances represented on the map were not authenticated.

¶65. "Before evidence can be submitted to the jury, a party must present a prima facie case of authenticity." *Greene v. State*, 282 So. 3d 645, 648 (¶16) (Miss. Ct. App. 2019). Authenticity of evidence is controlled by Rule 901 of the Mississippi Rules of Evidence.

¶66. Rule 901 requires that evidence be authenticated as a condition of being admitted. MRE 901(a). "Pursuant to Rule 901, 'to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.'" *Smart v. State*, 337 So. 3d 722, 728 (¶24) (Miss. Ct. App. 2022) (emphasis omitted) (quoting MRE 901(a)). So "under Rule 901, a party need only make a prima facie showing of authenticity . . . . [O]nce a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Id*. (citation omitted). The Advisory Committee Note to Rule 901(b)(9) explains the rule "covers systems such as x-rays, some chemical tests, and computers."

20

¶67. As a result, a predicate for admitting the calculations of a computer or machine is authentication. Taylor points to two longstanding cases for this proposition. For instance, "a radar device reading should be deemed admissible only upon a showing of the radar device's accuracy." *Stidham v. State*, 750 So. 2d 1238, 1241 (¶8) (Miss. 1999). Likewise, the results of an Intoxilizyer test are "deemed valid only when performed according to approved methods; performed by a person certified to do so; and performed on a machine certified to be accurate." *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990). Indeed, in that case, the Supreme Court reversed and remanded a guilty verdict when "[t]he [I]ntoxilyzer had no certificate of calibration to meet the requirements of the statute." *Id*. at 239.

¶68. As the Supreme Court did in 2016 when it decided *Walters*, we find instructive the Ninth Circuit Court of Appeals' analysis of the Google Earth program. *Lizarraga-Tirado*, 789 F.3d at 1109-11. There, a defendant had been charged with the illegal reentry into the United States, and at issue was whether "a Google Earth satellite image and a digital 'tack' labeled with GPS coordinates hearsay[.]" *Id*. at 1108-09.

¶69. The defendant asserted that "that both the satellite image on its own and the digitally added tack and coordinates were impermissible hearsay." *Id*. at 1109. The Ninth Circuit found that "[i]f the tack is placed manually and then labeled (with a name or GPS coordinates), it's classic hearsay . . . like drawing an X on a paper map and labeling it 'hidden treasure.'" *Id*. And just as our Supreme Court concluded in *Stidham* and *Johnston* regarding speed and alcohol measuring devices, "[a] proponent must show that a machine is reliable

21

and correctly calibrated, and that the data put into the machine (here, the GPS coordinates) is accurate." *Id*. at 1110. So "when faced with an authentication objection, the proponent of Google-Earth-generated evidence would have to establish Google Earth's reliability and accuracy." *Id*. This burden could possibly be met "for example, with testimony from a Google Earth programmer or a witness who frequently works with and relies on the program." *Id*.

¶70.    Such a step is crucial because like the speed calculation of a radar device or blood alcohol measurement of an Intoxilyzer, "[t]he real work is done by the computer program itself." *Id*. at 1110. Without such authentication, the evidence must be excluded. *See* MRE 901(b)(9); *see also Diaz v. County of Ventura*, No. CV 19-4695, 2021 WL 6752003, at *3 (C.D. Cal. Nov. 22, 2021) (where a district court excluded images from Google Earth when the proponent "provide[d] no explanation of the methodology he used to place these figures and calculate the measurements, or whether this is a well-accepted methodology within the field of reconstruction").[4]

¶71.    So the precedent on the admission of this type of evidence is well established. Before admitting the calculations of a machine or program, such as the results of a radar or BAC-measuring device or the distance measured by Google Earth or Google Maps, the proponent must first satisfy the requirements of MRE 901. In this case, there was no attempt to

---

[4] In *Lizarrago-Tirado*, because the "defendant didn't raise an authentication objection at trial" or "on appeal," but only focused on a hearsay objection, the evidence was allowed. *Id*. at 1110. In contrast, in this case defense counsel raised both an authentication objection and an authentication objection before the trial court, arguing specifically that the guidance from *Lizarrago-Tirado* required exclusion of Exhibit 4.

demonstrate or show that Google Earth was accurate, reliable, or even correctly calibrated at all.

¶72.  One federal court in Louisiana showed the proper route for laying the foundation to authenticate evidence of this type.  There, the plaintiff argued an expert's opinion regarding a roof inspection was inadmissible because it was based "in part on Google Earth photographs that have not been authenticated." *Baugh v. Voyager Indem. Ins. Co.*, No. 19-14275 2020 WL 7042859, at *4 (E.D. La. December 1, 2020).

¶73.  In response, the defendant provided a strong basis for authentication—the certificate from a records custodian. *Id*. at *4.  The company obtained a "Certificate of Authenticity of Laura Devine, Custodian of Records for Google, LLC." *Id.* at *4.  The certificate stated, "I Laura Devine, certify: 1.  I am a Custodian of Records for Google LLC ('Google'), located in Mountain View, California," and that she was "authorized to submit this Certificate of Authenticity on behalf of Google in response to a subpoena[.]" *Id*.  Crucially, the declaration set out that the custodian had "personal knowledge of the following facts and could testify competently thereto if called as a witness," offering that "[t]he image(s) in question were recorded by a Google camera on or about the date reflected on each of the records." *Id*.  Due to the certificate, the trial court declined to exclude the Google Earth images and allowed them to be considered for purposes of summary judgment. *Id*.

¶74.  Of course, authentication in this manner may not be required depending on how the distance is measured.  One time-honored method is where a witness personally measures the distance with a tape measure or other device.  Furthermore, certain types of maps are not

subject to the same types of authentication required for privately owned but publicly available programs such as Google Earth. For example, had this been a map certified by our State or federal government, it could have fallen under the purview of Mississippi Rules of Evidence 803(8), which excepts from hearsay certain public records, if reported to a public office in accordance with a legal duty."[5]  And our Supreme Court has previously ruled that because "state government publications are self-authenticating," it could "take judicial notice" of a state-created document. *AT&T Corp. v. Miss. Dep't of Info. Tech. Servs.*, 298 So. 3d 938, 946 n.5 (Miss. 2020).

¶75.  Ultimately, because the calculations contained in Exhibit 4 that were performed by the Google Earth program were not authenticated, the evidence should not have been admitted. This was the only proof upon which Taylor's conviction rested. Therefore, we reverse and remand for a new trial.

## IV. The State proved all essential elements of the crime charged in the

---

[5] For instance, state law established "the mechanism within state government for the storing, processing, extracting and disseminating of useful data and information relating to the state's resources." Miss. Code Ann. § 57-13-23 (Rev. 2014). This is subject to the MARIS program, or Mississippi Automated Resource Information System, which provides "interactive mapping, map services, image services, pre-generated printable maps, and maps from other sources." https://maris.mississippi.edu/HTML/maps.html#gsc.tab=0 (Last visited Aug. 31, 2022).

The Advisory Committee Note to Rule 901 notes the rule "does not foreclose taking judicial notice of the accuracy of a process or system." In this case, the State did not ask for the trial court to take judicial notice of the Google Earth image or its distance calculations pursuant to Mississippi Rule of Evidence 201. Further, courts are not uniform in whether they can take judicial notice of Google Earth or Map calculations. *See United States v. Orozco-Rivas*, 810 F. App'x 660, 668 n.7 (10th Cir. 2020) (taking judicial notice of distance calculated by Google Maps); *but see Johnson v. Helion Techs. Inc.*, No. 18-3276 2021 WL 4750182, at *3 (D. Md. October 12, 2021) (ruling that "[a] court cannot take judicial notice of the accuracy and reliability" of Google Earth or other mapping programs).

24

**indictment.**

¶76. While we are reversing and remanding due to the evidentiary error in this case, this does not halt our inquiry. For "a challenge to the sufficiency of the evidence should be addressed on appeal, even where the appellate court determines that reversal and remand is warranted based upon an evidentiary error in the trial court." *Hodges v. State*, 285 So. 3d 711, 713 n.1 (Miss. Ct. App. 2019).

¶77. In his final argument, Taylor argues the State failed to prove that persons under the age of eighteen were using the playground at Michael Memorial Church during the date that was alleged in the indictment. He insists the statute's restrictions "clearly and unambiguously [do] not apply to all playgrounds . . . but applies only to those 'utilized by persons under the age of eighteen (18) years." With that in mind, Taylor goes on to say that the State has the burden of proving beyond a reasonable doubt that "the Michael Memorial playground was being utilized on March 15, 2016, by persons who had yet to reach their eighteenth (18th) birthday, as it is an essential element of the offense."

¶78. When reviewing a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bradford v. State*, 337 So. 3d 277, 281 (¶13) (Miss. Ct. App. 2022) (citation omitted). "The issue on appeal is not whether the reviewing court would have found the defendant guilty; rather, the conviction must be affirmed if there was sufficient evidence for any rational trier of fact to have rendered a guilty verdict." *Id*. (internal quotation marks

omitted).

¶79.   First, Taylor offers no support for his interpretation of the statute.  There is no caselaw that states that the playground had to have been in use on the said date contained in the indictment.  Indeed, "failure to precisely prove an offense occurred during a specific time period is not grounds for reversal." *Mosby v. State*, 134 So. 3d 850, 853 (¶11) (Miss. Ct. App. 2014) (internal quotation marks omitted).  And "[w]ithin reasonable limits, proof of any date before the return of the indictment is sufficient." *Id.*

¶80.   Newmeier, the church administrator,  testified that "[a]nybody that really wants to" can use the playground.  And "[w]hile it is fenced in, that's mainly to keep the children in there while they are there . . . ."  He continued, stating that "[t]here are no locks on it."  The playground "is virtually open 24/7."  He also said that "[w]e have families that come over all the time to play."  Newmeier also testified the playground was there *before* Taylor moved into the Tara Brooke residence.

¶81.   Here, the trial court likely could have found beyond a reasonable doubt that based on Newmeier's testimony, children used the playground on the date stated in the indictment or "any date before the return of the indictment." *Id.*

¶82.   In conclusion, the fact-finder in this case could have found all the essential elements of the crime beyond a reasonable doubt, and the State successfully proved each essential element of the crime.

**CONCLUSION**

¶83.   Accordingly, for the foregoing reasons, we reverse Taylor's conviction and sentence

26

and remand for a new trial on the merits.

¶84. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD AND LAWRENCE, JJ., CONCUR. GREENLEE AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, J.; McDONALD AND McCARTY, JJ., JOIN IN PART. SMITH, J., NOT PARTICIPATING.**

**WILSON, P.J., CONCURRING IN RESULT AND DISSENTING IN PART:**

¶85. I concur that Taylor's conviction must be reversed and the case remanded for a new trial because critical evidence was not properly authenticated. I write separately for two reasons. First, I respectfully disagree with the majority regarding the proper interpretation of the criminal statute at issue. Based on the plain language of the statute and the rule of lenity, "the real property comprising" a "playground" is the playground itself, not the entire tract of land on which the playground is situated. Second, I write to emphasize that although the Google Earth image at issue in this case was not properly authenticated, such evidence does not raise significant *hearsay* concerns once it is properly authenticated.

I.      **"[T]he real property comprising" the "playground" is just the playground, not the entire tract of land.**

¶86. Mississippi law provides that a person who is required to register as a sex offender "shall not reside within three thousand (3,000) feet of *the real property comprising* a public or nonpublic elementary or secondary school, a child care facility, a residential child-caring agency, a children's group care home or *any playground*, ballpark or other recreational facility utilized by persons under the age of eighteen (18) years." Miss. Code Ann. § 45-33-

27

25(4)(a) (Rev. 2015) (emphasis added).[6]  Relying on an attorney general's opinion, the majority holds that "the real property comprising . . . any playground" is not just the playground but the entire tract of land on which the playground is situated.  Respectfully, this interpretation of the statute is contrary to the usual meaning of the word "comprising."

¶87.    As the late Justice Scalia and Bryan Garner explained,

> In normal English usage, if a group . . . "comprises" 300 lawyers, it contains precisely that number.  If it "includes" 300 lawyers, there may well be thousands of other members from all walks of life as well.  That is, the word *include* does not ordinarily introduce an exhaustive list, while *comprise* . . . ordinarily does.  That is the rule both in good English usage and in textualist decision-making.

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132 (2012) (footnote omitted) (citing dictionaries and usage guide).[7]

¶88.    *Black's Law Dictionary* likewise defines "comprising" as "[c]onsisting of exclusively; embracing to the exclusion of others."  *Comprising*, Black's Law Dictionary (11th ed. 2019).  *Black's Law Dictionary* states that this definition reflects the word's "usage . . . in normal

---

[6] Without additional information, it would be unclear whether the phrase "the real property comprising" modifies only "a public or nonpublic elementary or secondary school" or all of the places listed in the statute.  However, subsections (b) and (c) and the history of amendments to this Code section make clear that the phrase modifies the entire list.

[7] Justice Scalia and Garner note one exception to this rule: in patent law, "*comprise* is held to be synonymous with *include*" and typically "introduces a nonexhaustive list in the field of patent-claim drafting."  *Id.* at 133.  "But this is a narrow, anomalous exception."  *Id.*; *see also* Bryan Garner, *LawProse Lesson #146: The IP bar's special use of "comprise*," https://lawprose.org/lawprose-lesson-146-the-ip-bars-special-use-of-comprise/ (last visited January 10, 2023).

idiomatic writing." *Id.*[8]

¶89.    Thus, the common and ordinary meaning of "the real property comprising . . . any playground" (Miss. Code Ann. § 45-33-25(4)(a)) is the real property consisting exclusively of the playground and to the exclusion of all else.  We are bound to interpret "[a]ll words and phrases contained in . . . statutes . . . according to their common and ordinary acceptation and meaning."  Miss. Code Ann. § 1-3-65 (Rev. 2019); *accord Lawson v. Honeywell Int'l Inc.*, 75 So. 3d 1024, 1028 (¶9) (Miss. 2011).  Therefore, as applied in this case, the real property comprising the playground is the playground itself, not the rest of the church property.

¶90.    Moreover, even if the statute were ambiguous, "the longstanding rule of lenity applies" to an ambiguity in "a criminal statute."  *McGlasten v. State*, 328 So. 3d 101, 106-07 (¶24) (Miss. 2021).  As our Supreme Court recently explained,

> Under the rule of lenity, where a criminal statute is patently ambiguous, it *must* be interpreted in favor of the accused.  This is bedrock law in Mississippi.  And for more than a century, we have held that penal statutes must be strictly construed against the State and in favor of the accused.

*Id.* at 107 (¶25) (citations, quotation marks, brackets, and ellipsis omitted).  Applying the rule of lenity, when a criminal statute is ambiguous, "we have no choice but to apply the interpretation that favors [the accused]."  *Id.*  Here, that means even if the statute were ambiguous, we would have no choice but to interpret "the real property comprising . . . any playground" to mean the real property consisting exclusively of the playground, not the entire tract of land on which the playground is located.

---

[8] *Black's Law Dictionary* also recognizes that the word carries a different meaning in "the intellectual-property context."  *Comprising*, Black's Law Dictionary (11th ed. 2019).

29

¶91. In responding to these points, the majority makes no claim that its interpretation of the statute is consistent with the statute's actual text. Nor does the majority dispute that its construction is contrary to the common and ordinary meaning of the word "comprising." Rather, the majority relies on the statute's "purpose" and an attorney general's opinion. Neither argument is persuasive.

¶92. First, such reliance on a general statutory "purpose" has been "often criticized" as "that last resort of extravagant interpretation." *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality opinion). "[N]o law pursues its purpose at all costs, *and . . . the textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations*." *Id.* (emphasis added). Here, the Legislature could have achieved the "purpose" of protecting children from sex offenders more effectively by enacting mandatory life sentences or establishing an exile colony on our Barrier Islands. But the statute at issue imposes only certain specific limits on the places where sex offenders may live. This Court's function is to interpret the statute's plain language—including its "textual limitations." *Id.*; *see also Lawson*, 75 So. 3d at 1027 (¶7) ("The Court must not broaden or restrict a legislative act."). We do not simply adopt the interpretation that will criminalize the most conduct or provide the largest "zone of exclusion" (*ante* at ¶46) at all costs.

¶93. Second, it is well settled that an "[a]ttorney [g]eneral's opinion is not controlling law." *In re V.L.W.*, 751 So. 2d 1033, 1034 (¶6) (Miss. 1999). It "is merely persuasive authority" to the extent it actually persuades. *Miss. State & Sch. Emps.' Life & Health Plan v. KCC Inc.*, 108 So. 3d 932, 938 (¶15) (Miss. 2013) (declining to follow an unpersuasive attorney

general's opinion). Here, the 2007 attorney general's opinion cited by the majority is not persuasive. To begin with, that opinion did not even address playgrounds, which were not included in the statute until 2008. *See* 2008 Miss. Laws ch. 424, § 1 (H.B. 519). In 2007, the statute only provided that registered sex offenders could not "reside within one thousand five hundred (1,500) feet of the real property comprising a public or nonpublic elementary or secondary school or a child care facility." Miss. Att'y Gen. Op., 2007-00243, 2007 WL 2019771, *Trowbridge*, at *1 (May 18, 2007) (quoting Miss. Code Ann. § 45-33-25(4)(a) (Supp. 2006)). Thus, the attorney general's opinion only addressed schools and childcare facilities. Although the campus of a school or childcare facility often may extend to the real property line, the same cannot be said of a playground. In addition, the attorney general's opinion offered no reasoning or analysis to support its conclusion that "the real property comprising" a school or childcare facility always extends to the property line.[9]

¶94. Moreover, the majority's reliance on an attorney general's opinion is especially problematic because we are dealing with a criminal statute. The attorney general is not an ordinary administrative official but a prosecutor whose responsibilities include defending criminal convictions on appeal before the Supreme Court and this Court.[10] "[A] criminal statute[] is not administered by any agency but by the courts." *Crandon v. United States*, 494

---

[9] Instead, the opinion focused on the offender's residence, reasoning that his residence extends to his property line. Miss. Att'y Gen. Op., 2007-00243, 2007 WL 2019771, *Trowbridge*, at *1 (May 18, 2007). That point is not at issue in this case.

[10] *See Smith v. Hood*, 238 So. 3d 1125, 1127 (¶10) (Miss. 2018) (recognizing that the attorney general's office is a "prosecutorial office[]"); Miss. Code Ann. § 7-5-29 (Rev. 2019) ("The attorney general shall attend the supreme court, in person or by his assistant, and prosecute and defend therein all causes to which the state . . . is a party . . . .").

U.S. 152, 177 (1990). Accordingly, "criminal laws are for courts, *not for the Government*, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014) (emphasis added). The government's preferred interpretation of a criminal law is not entitled to deference. *United States v. Apel*, 571 U.S. 359, 369 (2014); *Crandon*, 494 U.S. at 177. Rather, courts have "an obligation" to interpret criminal statutes independently. *Abramski*, 573 U.S. at 191.[11]

¶95. In summary, whether based on the statute's plain language or the rule of lenity, "the real property comprising" a "playground" is the playground, not the entire tract of land.[12]

## II. Google Earth images must be properly authenticated but should not raise significant hearsay issues.

¶96. I concur with the majority that Exhibit 4 was not properly authenticated at trial because the State offered no evidence "to establish Google Earth's reliability and accuracy."

---

[11] Without explicitly making the argument, the majority seems to suggest that the Legislature tacitly adopted the 2007 attorney general's opinion by subsequently reenacting the statute. This interpretive principle "has special importance for administrative rulings and interpretations under constant legislative scrutiny," but it "*does not apply where a legislature paid no attention to such an interpretation during reenactment*." 2B Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 49:8, at 120 (7th ed. 2012) (emphasis added). Rather, when "the law is plain," and "[t]here is no indication that [the Legislature] was aware of [an] administrative construction . . . at the time it revised the statute," a statute's "reenactment does not constitute an adoption of a previous administrative construction." *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991). Here, "the law is plain," and there is no indication that the Legislature reenacted or revised this statute with knowledge of the 2007 attorney general's opinion—an opinion that has never been cited in a published judicial opinion or, so far as I can determine, anywhere else. Therefore, the majority is not deferring to any action by the Legislature but rather to a conclusory attorney general's opinion. This is a mistake because "the [Mississippi] Constitution of 1890 provides for the courts *and the courts alone*[] to interpret statutes." *King v. Miss. Mil. Dep't*, 245 So. 3d 404, 408 (¶12) (Miss. 2018) (emphasis added).

[12] It should be noted that if the Google Earth image (erroneously) admitted at trial is in fact accurate, this point will not make a difference in Taylor's case. If that image is accurate, Taylor's residence is well within 3,000 feet of the playground in question.

*United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015); *see* MRE 901(b)(9) (stating that "[e]vidence describing a process or system and showing that it produces an accurate result" satisfies the requirement of authenticity). Therefore, the State failed to offer "evidence sufficient to support a finding" that Exhibit 4 was what it purported to be—an accurate representation of the distance between Taylor's residence and the church property. MRE 901(a).

¶97.    Under Rule 901(a) of the Mississippi Rules of Evidence, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence *sufficient to support a finding* that the item is what the proponent claims it is." *Id.* (emphasis added); *see also* MRE 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). In a jury trial, "it is the jury who will ultimately determine the authenticity of the evidence, *not the court*." *Young v. Guild*, 7 So. 3d 251, 262 (¶36) (Miss. 2009) (emphasis added) (quoting *Sewell v. State*, 721 So. 2d 129, 140 (¶60) (Miss. 1998)).[13]  For evidence to be admissible, the proponent need only produce some "substantial evidence from which [the jury] could infer that the [evidence] was authentic." *Id.*

¶98.    Although Rule 901(a)'s authenticity requirement is not a high bar, the State did nothing in this case to meet it.  The State might have presented a sponsoring witness who could testify that she used Google Earth routinely and had verified that the program

_____

[13] Because this case was tried without a jury, the judge ultimately was responsible for both ruling on the admissibility of the evidence and—in his role as fact-finder—determining its authenticity.  However, the standard for admitting the evidence remains the same: whether there is sufficient evidence to support a finding that the evidence is authentic.

consistently measured distances accurately. *See Lizarraga-Tirado*, 789 F.3d at 1110 (stating

that Google-Earth-generated evidence could be authenticated by "a witness who frequently

works with and relies on the program"). But the State's sponsoring witness simply testified

that she used the program to calculate the distance between Taylor's home and the church.

She had nothing else to say about Google Earth or her use of the program, and she even

acknowledged that she had never visited the location in question. Accordingly, I agree with

the majority that the exhibit was not properly authenticated.[14]

¶99.    I write separately on this issue only to emphasize that once it is properly authenticated,

a typical Google Earth image should not raise serious hearsay issues. In this case, Akers

apparently input Taylor's address into Google Earth, and Google Earth generated a map with

a pin showing Taylor's residence. This type of labeled pin

> isn't hearsay. The hearsay rule applies only to out-of-court *statements*, and it
> defines a statement as "a *person's* oral assertion, written assertion, or
> nonverbal conduct." Fed. R. Evid. 801(a) (emphasis added).[15]  Here, the
> relevant assertion isn't made by a person; it's made by the Google Earth
> program. Though a person types in the [address or] GPS coordinates, he has
> no role in figuring out where the [pin] will be placed. The real work is done
> by the computer program itself. The program analyzes the [address or] GPS
> coordinates and, without any human intervention, places a labeled [pin] on the
> satellite image. Because the program makes the relevant assertion—that the
> [pin] is accurately placed at the labeled [address or] GPS coordinates—there's
> no statement as defined by the hearsay rule.

---

[14] I also agree with the majority that we cannot take judicial notice that Google Earth is accurate and reliable.  The State did not ask the trial court to take judicial notice of this "fact," nor has it argued that we should do so on appeal.  Moreover, the State has not identified any basis for us to conclude that Google Earth's accuracy and reliability are "not subject to reasonable dispute."  MRE 201(b).

[15] Mississippi Rule of Evidence 801(a) is identical to the federal rule.  MRE 801(a).

*Lizarraga-Tirado*, 789 F.3d at 1109-10.  In making this point, the Ninth Circuit Court of Appeals noted that it was joining at least five "other circuits that have held that machine statements aren't hearsay."  *Id.* at 1110 (collecting cases).  Similarly, this Court previously explained that an "automatic email notification" was not hearsay under Rule 801 because it "was not made by a human."  *Smith v. State*, 168 So. 3d 992, 1000 (Miss. Ct. App. 2013), *aff'd in part and vacated in part on other grounds*, 136 So. 3d 424 (Miss. 2014).[16]

¶100.  For the same reasons, the scale that is part of Exhibit 4 is not hearsay.  It was generated by Google Earth, not a human.  Finally, if Google Earth calculates distances between two points, the calculation is an assertion by Google Earth and is not hearsay.

¶101.  Here, Akers recorded a distance calculated by Google Earth by making a handwritten notation on Exhibit 4.  Akers's handwritten notation is technically hearsay because it is an out-of-court statement about Google Earth's calculation.  But any hearsay problem with the notation was both easily avoidable and ultimately harmless because Akers was present in court to testify regarding Google Earth's calculations.

¶102.  In short, I agree with the majority that Google Earth evidence such as Exhibit 4 must be authenticated by some "evidence sufficient to support a finding" (MRE 901(a)) that Google Earth reliably and accurately measures distances.  I write separately on this issue only to emphasize that once that requirement is met, calculations and information generated by the program itself do not raise hearsay issues.

**GREENLEE, J., JOINS THIS OPINION.  McDONALD AND McCARTY, JJ.,**

---

[16] In *Smith*, the Supreme Court did "not review [this Court's] holding on this issue." *Smith*, 136 So. 3d at 431 n.11.

**JOIN THIS OPINION IN PART.**